**GEORGE CANELLOS**
Regional Director
**TODD BRODY**
Attorneys for Plaintiff
Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Room 400
New York, NY 10281
(212) 336-0080 (Brody)

**11 CIV 9056**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

- against -

ALTERNATIVE GREEN TECHNOLOGIES, INC.,
MITCHELL SEGAL, BELMONT PARTNERS,
LLC, JOSEPH MEUSE, HOWARD BORG, DAVID
RYAN, VIKRAM KHANNA, and PANASCOPE
CAPITAL INC.,

    Defendants, and

SIERRA RANGE HOLDINGS, INC., SENIOR
CAPITAL SERVICES, INC., LAW OFFICES OF
MITCHELL SEGAL, P.C., and THOMAS RUSSO,

    Relief Defendants.

-------------------------------------------------------- x

ECF CASE

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against defendants Alternative Green Technologies, Inc. ("AGTI"), Mitchell Segal ("Segal"), Belmont Partners, LLC ("Belmont"), Joseph Meuse ("Meuse"), Howard Borg ("Borg"), David Ryan ("Ryan"), Vikram Khanna ("Khanna"), and Panascope Capital Inc. ("Panascope") (collectively, "Defendants") and Sierra Range Holdings, Inc., Senior Capital Services Inc., Law Offices of Mitchell Segal, P.C., and Thomas Russo ("Russo") (collectively, "Relief Defendants") alleges, as follows:

## SUMMARY

1. This action arises from a scheme by Defendants to issue and illegally sell purportedly unrestricted securities of AGTI by defrauding a transfer agent.

2. From September 2008 through September 2009, Defendants Segal, AGTI, Meuse and Belmont engaged in a series of fraudulent activities in order to sell AGTI stock to the general public. These activities included AGTI and Segal obtaining and furnishing false documents (including a sham assignment of debt and a fabricated and backdated corporate resolution and convertible note), to support a legal opinion letter that was provided to AGTI's transfer agent so that the transfer agent would issue millions of shares of purportedly unrestricted AGTI stock in an unregistered offering. Belmont and Meuse assisted AGTI and Segal in creating the false, backdated, and fabricated documents and furnishing them to the attorney for use in drafting the opinion letter. As a result of this fraud, Borg, Ryan, Khanna, and Panascope each sold unregistered shares of AGTI to the public without a valid registration exemption.

## VIOLATIONS

3. By virtue of the conduct alleged herein, (a) Defendants, directly or indirectly, have engaged in acts, practices, and courses of business that constitute violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77(e)(a) and 77(e)(c)]; and (b) defendants AGTI, Segal, Belmont, and Meuse, directly or indirectly, have engaged in acts, practices, and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

4. Unless each of the Defendants is permanently restrained and enjoined, they will again engage in acts, practices, and courses of business similar to those set forth in this Complaint.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C §§ 78u(d), 78u(e), and 78aa]. The Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or the mails in connection with the acts, practices, and courses of business alleged in this Complaint.

6. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391. Certain of the transactions, acts, practices and courses of business alleged herein occurred in this district. Specifically, during the relevant period, AGTI's share prices were quoted on Pink OTC Markets Inc. ("Pink Sheets"), now named OTC Markets Group Inc., which is headquartered in this district. In addition, defendant Segal made use of brokerage firms located in this district and relief defendant Russo resides in this district.

## DEFENDANTS

8. AGTI, a Nevada corporation headquartered in Uniondale, New York, manufactures and sells insulated concrete forms through a subsidiary ReddiForm. AGTI was formerly known as Niteagle Systems, Inc. ("NGLE") before November 5, 2008. Beginning in approximately January 2008, AGTI was quoted under the symbol "AGTI" on Pink OTC Markets

3

Inc. ("Pink Sheets"), an electronic quotation system for certain over-the-counter securities. AGTI has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act, and it does not file periodic reports under Section 13(a) or 15(d) of the Exchange Act.

9. Segal, age 55, a resident of Roslyn, New York, is the President and CEO of AGTI. Segal is an attorney licensed to practice in the state of New York.

10. Belmont, a Virginia corporation, was incorporated in April 2004. Belmont's core business is to obtain and later sell blocks of controlling shares of publicly traded "shell corporations" for their use in reverse mergers. Belmont purchased a control block in NGLE on or about October 16, 2008, and sold the control block to Segal on or about November 5, 2008.

11. Meuse, age 41, a resident of Warrenton, Virginia, is the founder, president and sole owner of Belmont. He is also the president and majority owner of Pacific Stock and Transfer Company ("PSTC"), a transfer agent registered with the Commission. Meuse served as a director of AGTI in October 2008.

12. Borg, age 56, is a resident of Woodbury, New York. Borg was an employee of AGTI from its inception through October 2009. Borg is also the President and sole shareholder of Janacor, Inc., ("Janacor") a New York corporation incorporated in September 2008. In September 2008, Segal sold Borg a 50% interest in Segal's future income and equity assets for $1.25 million.

13. Ryan, age 51, is a resident of Sea Bright, New Jersey. Ryan and his partner, Thomas Russo, run TheStockProphet.com, a stock promotion service.

4

14.     Panascope is a Nevada corporation incorporated in May 2004, with its principal place of business in Las Vegas, Nevada.

15.     Khanna, age 46, a resident of Porter Ranch, California, is the president and sole shareholder of Panascope.

## RELIEF DEFENDANTS

16.     Sierra Range Holdings, Inc. is a New York corporation incorporated in November 2006, with its principal place of business in Great Neck, New York. Segal is the president and sole shareholder of Sierra.

17.     Senior Capital Services, Inc. is a New York corporation incorporated in January 2009, with its principal place of business in Uniondale, New York. Segal is the president and sole shareholder of Senior Capital Services.

18.     The Law Offices of Mitchell Segal, P.C. is a New York professional corporation with its principal place of business in Great Neck, New York.

19.     Thomas Russo, age 51, is a resident of Bronx, New York. Russo runs TheStockProphet.com along with Ryan.

## OTHER ENTITIES

20.     PSTC, a Nevada corporation, was incorporated in March 1983, and acted as AGTI's stock transfer agent.

21.     Equishare Financial, Inc. ("Equishare"), a Nevada corporation, was incorporated in April 2004. NGLE's former president, Sonny Ball ("Ball"), is Equishare's president and sole shareholder.

## FACTS

### I. Belmont's Acquisition and Sale of the Publicly-Traded Shell

#### A. AGTI's Corporate History

22. AGTI was originally incorporated in October 1996 as World Shopping Network, Inc. In May 2006, after a series of name changes, World Shopping Network, Inc. became NGLE, a self-described "development stage Nevada corporation formed exclusively to capture the untapped market opportunity for enhanced vision system sales and licensing to a wide variety of mobile applications."

23. In or about August 2006, Ball, NGLE's CEO and controlling shareholder, suffered a stroke, and the prototype for NGLE's sole product was lost. NGLE purportedly engaged in some unsuccessful capital-raising efforts to acquire funding for its research and development, but did not conduct any further business operations.

24. In or about October 2008, Belmont, which describes itself as a "leading provider of public shell vehicles for use in reverse merger transactions," contacted Ball to purchase a control block of NGLE owned by Ball (personally or through Equishare). At the same time that Belmont was negotiating the purchase of the control block of NGLE from Ball, it was also negotiating the sale of the control block of NGLE from Belmont to Segal.

25. On or about October 16, 2008, Belmont purchased a control block of NGLE held by Ball and Equishare and appointed Meuse to be NGLE's sole director.

26. On or about November 5, 2008, Segal purchased a control block of NGLE from Belmont and appointed himself as NGLE's sole director.

6

27. Before agreeing to purchase the control block of NGLE from Belmont, Segal insisted that Belmont provide Segal with various documents including evidence that NGLE owed certain aged debt (the "Aged Debt"), an assignment purporting to assign the Aged Debt to another entity, and an affidavit signed by Ball affirming that NGLE had never been a shell company.

28. Segal made these requests to create the basis for the issuance of purportedly unrestricted stock that could then be sold into the public market. Segal used this stock to fund an internet stock promotion and sold the remaining shares into the market at a price inflated by the promotional efforts.

**B.    The Aged Debt, False Shell Affidavit, and Sham Assignment**

29. On November 12, 2008, in response to Belmont's repeated requests that Ball provide evidence of the Aged Debt owed by NGLE, Ball presented Belmont with a series of cancelled checks that purported to be payments made by Equishare on behalf of NGLE. Ball also provided Belmont with a sham Assignment of Debt executed by Ball on Equishare's behalf purporting to assign the Aged Debt reflected in the cancelled checks (the "Assignment"). The Assignment included a debt of $101,082 purportedly incurred in 2006, and $270,019 purportedly incurred during 2007 and 2008.

30. With respect to the $101,082 "debt" that was purportedly incurred in 2006, at least $86,500 of this amount was simply the purchase price Equishare paid for NGLE stock when an entity called Pegasus Group brokered the sale from NGLE's previous owner. Ball wrote "part of purchase" on the copy of the $85,600 check he sent Belmont. This portion of the payment, at

7

least, was in no way a debt NGLE owed Equishare because Equishare had received value (i.e., NGLE stock) for the payment when it was made.

31. Although the Assignment stated that Equishare received $200 from the "Assignee" as consideration for the Assignment, this payment was never made.

32. When Ball executed the Assignment, the space identifying the "Assignee" was left blank.

33. Ball provided the Assignment to Belmont, who then provided it to Segal. Sometime after November 12, 2008, Segal caused Janacor, an entity he controlled through his business partner Borg, to execute the Assignment on behalf of Janacor as Assignee so that it would appear that the debt was held by a non-affiliate of AGTI.

34. Janacor, however, was an affiliate of AGTI. First, Borg, the president and sole shareholder of Janacor, was an employee of AGTI. Second, Borg had purchased a 50% interest in Segal's future income and equity assets. Third, Segal explicitly directed Janacor's actions.

35. Belmont also drafted an affidavit which Ball signed affirming that NGLE was not and had never been a shell company (the "Shell Affidavit"). This affidavit was false because NGLE was in fact a shell company without any sales, assets, or operations.

36. Both Meuse and Segal knew, or were reckless in not knowing, that the Shell Affidavit was false. When Belmont purchased NGLE, Meuse knew, or was reckless in not knowing, that NGLE did not have any operations and was dormant. Likewise, when Segal purchased NGLE he knew, or was reckless in not knowing, that it had no operations. The stock purchase agreement Segal executed with Belmont does not refer to NGLE having any ongoing operations and there are no other documents evidencing any ongoing operations by NGLE.

8

Both Meuse and Segal served as directors of NGLE and received financial records showing that NGLE's bank account balance had never exceeded $4,000 and it had no sales prior to Belmont's purchase of it.

### C. The Backdated Corporate Resolution

37. On or about December 11, 2008, Meuse and Segal fabricated a corporate resolution of NGTL purporting to establish that the Aged Debt purportedly owed by NGLE – now AGTI – to Equishare was a pre-existing security with a convertible feature. On or about December 11, 2008, Belmont sent Segal a *draft* corporate resolution purporting to acknowledge debt owed by NGLE to Equishare and stating that the debt could be converted into common shares of NGLE stock. Segal changed several of the terms of this draft including the conversion ratio and the purported date of execution (i.e. October 31, 2008). Despite the fact that at the time – December 2008 – Segal was the sole director of NGLE, Meuse, purporting to act as sole director of NGLE, signed the corporate resolution and backdated it to October 31, 2008 (the "Corporate Resolution"). The Corporate Resolution falsely acknowledged a $101,082 debt owed by NGLE to Equishare, to third parties for "investments made and monies paid between February 2006 and April 2006, [sic] on behalf of [NGLE]." The Corporate Resolution also stated that the debt could be converted into common shares of NGLE at the option of the holder or its assignees.

38. Segal, Belmont, and Meuse all knew, or were reckless in not knowing, that the Corporate Resolution was going to be used as a basis for the transfer agent to issue certificates for AGTI stock without a restricted legend.

9

39. On December 12, 2008, Segal changed NGLE's name to AGTI and simultaneously conducted a 1-for-20,000 reverse share split.

40. On December 23, 2008, AGTI entered into a reverse merger with ReddiForm WorldWide, Inc. ("RWW"), another corporation Segal owned, causing RWW to control AGTI. RWW's only asset was a license to sell an insulated concrete form ("ICF") product used to construct homes and other buildings. Once the reverse merger was complete, RWW produced, marketed, and sold construction materials in modest quantities but AGTI and Segal's primary focus was issuing, distributing, and selling purportedly unrestricted shares of stock to the public.

## II. The Scheme to Defraud the Transfer Agent

### A. The Notice of Conversion

41. On January 5, 2009, Segal directed Borg, on behalf of Janacor, to execute a Notice of Conversion converting the $101,082 debt purportedly incurred by Equishare in 2006 and purportedly assigned to Janacor by the Assignment, into 3,814,415 AGTI shares, just under the 10% threshold of total shares outstanding that would make Janacor a presumptive affiliate of AGTI.

42. AGTI's transfer agent, PSTC, was responsible for issuing AGTI's stock certificates. AGTI stock could not be resold to the public if the stock certificates bore a restrictive legend. A restrictive legend is a legend the transfer agent places on stock certificates stating, among other things, that the shares represented by those certificates (a) have not been registered under the Securities Act; (b) are "restricted securities" as that term is defined in Securities Act Rule 144; and (c) may not be offered for sale, sold, or otherwise transferred except pursuant to registration or an exemption from registration, the availability of which is to be

10

established to the satisfaction of the company issuing the shares (in this case, AGTI). To obtain unrestricted stock certificates for their AGTI shares from PSTC – a necessary prerequisite to reselling those shares in the market – AGTI and Segal, assisted by Belmont and Meuse, engaged in a fraudulent scheme to make it appear that such issuance complied with the exemption from the stock sale registration requirement codified in Rule 144 of the Securities Act.

### B. The Attorney Opinion Letter

43. PSTC's ordinary business practice was: (1) to require as a prerequisite to issuing stock certificates without a restricted legend the submission of a legal opinion approved by the issuer stating that the requested shares could be issued on an unrestricted basis and (2) to rely upon the veracity and authenticity of such legal opinion, without any independent investigation.

44. In order to get a legal opinion stating that the requested shares could be issued on an unrestricted basis, AGTI would have to demonstrate that: (1) AGTI had never been a shell company; (2) the proposed recipient of the unrestricted shares was not an affiliate; and (3) the proposed recipient of the unrestricted shares would be in actual compliance with Rule 144's requirement that the security had been held for the required one-year holding period.

45. On January 26, 2009, an employee of Belmont introduced Segal to an attorney via email and asked that attorney for an opinion letter on AGTI's behalf. This employee sent several documents to the attorney, including the Shell Affidavit, which Meuse knew to be false, the sham Assignment and the Corporate Resolution, which Meuse knew to be fabricated and backdated. The Belmont employee informed the attorney that Segal was seeking a legal opinion letter to be issued "tonight" opining that shares of AGTI should be deemed unrestricted and

11

issued without a restricted legend. The employee vouched for the documents, stating "all the documentation is *succinct and clear*." (Emphasis added).

### C. The Fabricated and Backdated Convertible Note

46. In order to obtain the attorney opinion letter, Belmont, Meuse and Segal fabricated and backdated a so-called Restated 6% Convertible Promissory Note (the "Convertible Note"). Drafts of this Convertible Note were emailed between a Belmont employee and Segal, and Meuse's signature was affixed to the Note, with his authorization, which purported to be executed on October 31, 2008, but was in fact executed on or about January 26 or 27, 2009. The Convertible Note identified the same $101,082 debt and the conversion feature contained in the Corporate Resolution, but added an interest rate, payment methods and an acceleration clause – none of which are referred to in the Corporate Resolution.

47. Although the Convertible Note purported to be "Restated," no original note or other security existed.

48. On or about January 27, the attorney issued a legal opinion letter opining that Janacor "held the indebtedness cumulatively for a period exceeding the one-year holding requirement set forth in Rule 144" (the "Opinion Letter"). The Opinion Letter states that the attorney specifically relied on AGTI's representation that AGTI had never been a shell company and that Janacor was not an affiliate of AGTI. These representations were false. The Opinion Letter also specifically referred to and relied upon the sham Assignment and Convertible Note, which had not existed previously but had been fabricated and backdated, and the backdated Corporate Resolution.

49. On or about January 28, 2009, Segal submitted the Notice of Conversion, Assignment, Opinion Letter, Convertible Note and Corporate Resolution to PSTC.

50. The individual at PSTC responsible for reviewing Rule 144 stock issuances followed the procedure applicable to all requested Rule 144 issuances. The individual reviewed the Opinion Letter (which was based on falsehoods) and the Corporate Resolution relating to the Aged Debt (the terms of which had been dictated by Segal, although Meuse had backdated the document to conceal that fact) and the Convertible Note (which had been fabricated). Based upon this review, and in reliance upon the Opinion Letter, PSTC issued stock certificates to Janacor representing 3,814,415 shares of AGTI stock that contained no restrictive legend.

### III. The Unlawful Distribution and Sale of AGTI's Shares

51. Segal directed Borg to deposit a portion of the stock certificates without restrictive legends into a brokerage account located in New York, New York, that Born had previously opened in Janacor's name upon Segal's instructions.

52. Segal directed that a portion of the stock certificates issued to Janacor be cancelled and reissued to stock promoters as payment for organizing and/or conducting promotions of AGTI's stock.

53. On or about March 12, 2009, Segal directed PSTC to cancel a stock certificate representing 568,988 shares of AGTI issued to Janacor and reissue it in the name of Panascope, a company owned by Khanna. On or about April 6, 2009, Khanna transferred 225,000 of these shares to a stock promoter named Ryan.

54. On or about April 14, 2009, Segal directed PSTC to cancel a stock certificate representing 384,615 shares of AGTI issued to Janacor and to reissue a stock certificate

13

representing 225,000 shares to Ryan and the remaining 159,615 shares back to Janacor. These shares were sent to Ryan as compensation for Ryan sending out promotional emails touting AGTI on or about April 15 and 16, 2009, and paying others in cash to do the same.

55. On or about April 28, 2009, Segal directed PSTC to cancel a stock certificate in the amount of 568,991 shares of AGTI issued to Janacor and to reissue the shares in the form of a stock certificate to Ryan in the same amount. Ryan received the shares into his personal brokerage account on or about April 30, 2009. On or about May 1, 2009, Ryan requested that 108,991 of these shares of AGTI be transferred to another of his personal brokerage accounts. Ryan received the shares in his account on or about May 5, 2009. On or about May 7, 2009, Ryan transferred the shares to Panascope's brokerage account. On the Letter of Authorization pertaining to this transfer, Ryan indicated that he was "returning shares client overpaid for consulting fee." These shares Ryan retained were sent to him as compensation for sending out promotional emails touting AGTI on or about May 4, 5, and 6, 2009, and paying others in cash to do the same.

56. In or around April through June 2009, Ryan sold his AGTI shares for a profit of $190,408.39, approximately $47,800 of which he shared with his business partner, Thomas Russo.

57. In or around April through May 2009, Panascope and Khanna sold their AGTI shares for a profit of $74,420.31.

58. In or around February through September 2009, Janacor sold AGTI shares into the public market for total proceeds of $317,256.77. Segal directed Borg to remit the proceeds of these sales back to Segal by sending $240,000 to the Law Offices of Mitchell Segal, P.C.,

$13,500 to Segal's company Sierra Range Holding, Inc., $20,150 to Segal's company Senior Capital Services Inc., and $8,500 to Segal in cash. Segal then used these funds to pay Belmont at least $119,500 of the money it owed Belmont for the purchase of AGTI. Borg kept the remaining $35,106.77.

## IV. The Unlawful September Issuance

59. On or about September 14, 2009, Segal submitted to PSTC a request for an issuance of stock certificates without restrictive legend representing 4,264,151 shares of AGTI to Janacor. This purported issuance supposedly converted a debt in the amount of $113,000 owed to Equishare for payments on behalf of NGLE between May 2007 and June 2007 that purportedly had been assigned to Janacor in the Assignment.

60. A second attorney opinion letter, dated September 12, 2009, opined that this issuance met the requirements of Rule 144. The second attorney opinion letter relied upon the false representations that AGTI had never been a shell company and that Janacor was not an affiliate of AGTI.

61. This second opinion letter also relied upon a Restated 6% Convertible Promissory Note purportedly executed by Segal on November 6, 2008 (the "Second Convertible Note"), a Notice of Conversion signed by Borg on September 11, 2009, at Segal's direction, on behalf of Janacor (the "Second Notice of Conversion"), and a board resolution acknowledging the debt purportedly signed by Segal on September 6, 2009 (the "Second Board Resolution"). The Second Convertible Note did not exist, in fact, until sometime in September 2009 when Segal created it in connection with this offering and backdated it to November 6, 2008.

15

62.     These 4,264,151 purportedly unrestricted shares of AGTI have been issued to Janacor without restrictive legend, but have not been sold. The shares remain in Janacor's brokerage account in New York, New York, controlled by Borg.

### FIRST CLAIM FOR RELIEF

**(Against AGTI and Segal)**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a) and (c) thereunder**

63.     The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 of this Complaint.

64.     By engaging in the acts and conduct alleged herein, AGTI and Segal, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities issued by AGTI, have:

    a.      Employed devices, schemes, and artifices to defraud; and ...

    c.      Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

65.     AGTI and Segal engaged in the above conduct knowingly or recklessly.

66.     By reason of the foregoing, AGTI and Segal, directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5(a) and (c) thereunder [C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### (Against Segal, Belmont, and Meuse)
### Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

67. The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 66 of this Complaint.

68. By engaging in the acts and conduct alleged herein, Segal, Belmont and Meuse knowingly provided substantial assistance to AGTI's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)], and thereby are liable under those provisions as aiders and abettors, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

69. By reason of the foregoing, Segal, Belmont, and Meuse have violated and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF
### (Against all Defendants)
### Violation of Sections 5(a) and 5(c) of the Securities Act

70. The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 69 of this Complaint.

71. The AGTI shares that AGTI, Segal, Borg, Ryan, Khanna, and Panascope offered and sold to the investing public were "securities" as defined by Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10].

72. AGTI, Segal, Belmont, and Meuse were necessary participants or substantial factors in the offer and sale of AGTI shares sold to the investing public by AGTI, Segal, Borg, Ryan, Khanna, and Panascope.

73. AGTI, Segal, Belmont, Meuse, Borg, Ryan, Khanna, and Panascope directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to offer and sell securities through the medium of a prospectus or otherwise when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

74. By reason thereof, AGTI, Segal, Belmont, Meuse, Borg, Ryan, Khanna, and Panascope have violated and unless enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### FOURTH CLAIM FOR RELIEF
(Against Relief Defendants)

75. The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 74 of this Complaint.

76. The Relief Defendants received ill-gotten funds, at the least, in the form of proceeds from the sale of AGTI shares that were transferred to them illegally.

77. The Relief Defendants do not have a legitimate claim to the funds they received from the sale of AGTI shares.

78. By reason of the foregoing, the Relief Defendants should be required to disgorge the proceeds of the sales of any AGTI shares.

**PRAYER FOR RELIEF**

**WHEREFORE** the Commission respectfully requests that the Court grant the following relief:

**I.**

A final judgment permanently restraining and enjoining AGTI, Segal, Belmont, and Meuse, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

A final judgment permanently restraining and enjoining AGTI, Segal, Belmont, Meuse, Borg, Ryan, Khanna, and Panascope, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**III.**

A final judgment ordering AGTI, Segal, Belmont, Meuse, Borg, Ryan, Khanna, Panascope, and the Relief Defendants to disgorge their ill-gotten gains, plus prejudgment interest.

**IV.**

A final judgment ordering Segal, Belmont, Meuse, and Ryan, to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

A final judgment enjoining and restraining AGTI, Segal, Belmont, and Meuse from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## VI.

A final judgment barring Segal and Meuse from serving as an officer or director of any pubic company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VII.

Such other and further relief as the Court deems appropriate.

Dated: New York, New York
December 12, 2011

Respectfully submitted,

By: _____
George S. Canellos
Regional Director
Todd Brody (BrodyT@sec.gov)
Megan R. Genet (GenetM@sec.gov)
Securities and Exchange Commission
3 World Financial Center, Room 400
New York, New York 10281-1022
Telephone (212) 336-0080 (Brody)

Of Counsel:
    David Rosenfeld
    Steven G. Rawlings