UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x
                                              :

SECURITIES AND EXCHANGE COMMISSION,            :

                      Plaintiff,                :

                     - against -              :

ALTERNATIVE GREEN TECHNOLOGIES, INC., MITCHELL    :    11 Civ. 9056 (DAB)
SEGAL, BELMONT PARTNERS, LLC, JOSEPH MEUSE, HOWARD  :    ECF CASE
BORG, DAVID RYAN, VIKRAM KHANNA, and PANASCOPE     :
CAPITAL INC.                                                :

                     Defendants,               :

SIERRA RANGE HOLDINGS, INC., SENIOR CAPITAL SERVICES,  :
INC., LAW OFFICES OF MITCHELL SEGAL, P.C., and THOMAS   :
RUSSO,                                                  :

                     Relief Defendants.        :

------------------------------------------------------------------------ x

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS BY DEFENDANTS
BELMONT PARTNERS, LLC AND JOSEPH MEUSE PURSUANT TO RULES 12(B)(6) AND 9(B)

Todd D. Brody
Senior Trial Counsel
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-0080
brodyt@sec.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES

PRELIMINARY STATEMENT                                                                    1

THE ALLEGATIONS IN THE COMPLAINT                                                         3

ARGUMENT                                                                                 6

I. STANDARD FOR DISMISSAL UNDER RULE 12(B)                                               6

II. THE SEC HAS PROPERLY ALLEGED SCHEME LIABILITY AGAINST SEGAL AND AGTI                 6

    A.    The Complaint Alleges Conduct Beyond Misrepresentations                7

    B.    The Complaint Alleges Inherently Deceptive Conduct                     10

III. MOVING DEFENDANTS AIDED AND ABETTED THE SCHEME                                      12

    A.    Moving Defendants Substantially Assisted the Fraud                     12

    B.    Moving Defendants Misstate the Scienter Requirement                    15

    C.    The SEC has Properly Pled Scienter Even if Reckless Conduct is not Sufficient    16

IV. THE COMMISSION HAS PROPERLY ALLEGED SECTION 5 CLAIMS                                 21

V. DEFENDANTS' CLAIM THAT THEY DO NOT UNDERSTAND THE COMPLAINT IS FALSE                  23

CONCLUSION                                                                               26

**TABLE OF AUTHORITIES**

FEDERAL STATUTES AND RULES

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ........................................... Passim
Rule 10b-5 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5........................................ Passim
Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. §§ 77(e)(a), (c)..................................... Passim
Fed. R. Civ. P. 8(a) ...................................................................................................................................... 6
Fed. R. Civ. P. 9(b)................................................................................................................................. Passim
Fed. R. Civ. P. 12(b)(6) .......................................................................................................................... Passim

CASES

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997)....................... 27
*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) .................................................................. 8
*ATSI Communications, Inc. v. The Shaar Fund, Ltd.* ........................................................................................ 8
*Bangkok Crafts Corp. v. Capitolo di San Pietro*, 03 Civ. 0015, 2006 U.S. Dist. LEXIS 49161 at *13 (S.D.N.Y.
    July 18, 2006) ........................................................................................................................................... 26
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ..................................................................................... 8
*Berk v. Tradewell*, Inc., 01 Civ. 9035, 2003 U.S. Dist. LEXIS 12078 *38-39 (S.D.N.Y. July 16, 2003)........... 27
*Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)........................................................................................ 19
*Graham v. SEC*, 222 F.3d 994, 1004-05 (D.C. Cir. 2000) ...................................................................... 17
*IIT v. Cornfeld*, 619 F.2d 909, 925 (2d Cir. 1980) ........................................................................................ 14
*In re Alstom SA*, 406 F. Supp.2d 433, 475 (S.D.N.Y. 2005)........................................................................... 10
*In re Parmalat Sec. Litig.*, 376 F. Supp.2d 472, 501 (S.D.N.Y. 2005)............................................................... 9
*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) ............ 8
*Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, No. 94 Civ. 8301,
    1995 WL 608323 *3 (S.D.N.Y. Oct. 16, 1995)........................................................................................... 26
*Meisel v. Grundberg*, 651 F. Supp.2d 98, 118 (S.D.N.Y. 2009)..................................................................... 17
*MTV Networks v. Curry*, 876 F. Supp. 202, 207 (S.D.N.Y. 1994) .................................................................. 17
*Rolf v. Blyth, Eastman, Dillon & Co., Inc.*, 570 F.2d 38, 48 (2d Cir. 1978).................................................... 14
*Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) .................................................................................. 26
*Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)......................................................................................... 26
*SEC v. Spongetech Delivery Systems, Inc.*, 10-CV-2031, 2011 U.S. Dist. LEXIS 26146 *25
    (E.D.N.Y. March 14, 2011)........................................................................................................................ 24
*SEC v. Apolant*, 411 F. Supp.2d 271, 277-78 (E.D.N.Y. 2006)....................................................................... 14
*SEC v. Aragon Capital Advisors*, 07 Civ. 919, 2011 U.S. Dist. LEXIS 82531 *53 N.17
    (S.D.N.Y. July 26, 2011) ............................................................................................................................ 19
*SEC v. Boock*, 09 Civ. 8261, 2011 U.S. Dist. LEXIS 95363 *49-50 (S.D.N.Y. Aug. 25, 2011)........................ 24
*SEC v. Brown*, 740 F. Supp.2d 148, 171-72 (D.C. 2010).............................................................................. 11
*SEC v. Burns*, 355 F. Supp.2d 917, 921 (N.D. Ill. 2003)............................................................................... 27
*SEC v. Cavanaugh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).......................................................................... 23
*SEC v. Czarnick*, 10 Civ. 745, 2010 U.S. Dist. LEXIS 125463 (S.D.N.Y. Nov. 29, 2010) ................................ 24
*SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)......................................................................................... 19
*SEC. v. Drucker*, 76 Civ. 2643, 1983 U.S. Dist. LEXIS 13442 (S.D.N.Y. Sept. 26, 1983) ............................... 12
*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1995), *cert denied*, 522 U.S. 813 (1997) ............................................ 15
*SEC v. Fraser*, No. CV-09-00443, 2010 U.S. Dist. LEXIS 7038 (D. Ariz. Jan. 28, 2010) ................................. 11

*SEC v. Gabelli*, 08 Civ. 3868, 2010 U.S. Dist. LEXIS 27613 *24 (S.D.N.Y. March 17, 2010), *rev'd on other grounds*, 653 F.3d 49 (2d Cir. 2011) ................................................................................................. 17

*SEC v. Geswein*, 5:10CV1235, 2011 U.S. Dist. LEXIS 111904 (N.D. Ohio), *adopted, rejected, and modified in non relevant part*, 2011 U.S .Dist LEXIS 111898 (N.D. Ohio Sept. 29, 2011) ..................................... 12

*SEC v. Gold*, 05-CV-4713, 2006 WL 3462103 *3 (E.D.N.Y. Aug. 18, 2006). ................................................ 26

*SEC v. Greenstone Holdings, Inc.*, 10 Civ. 1302, 2012 U.S. Dist. LEXIS 44192 * 33 (S.D.N.Y. March 28, 2012) ....................................................................................................................................................... 24

*SEC v. Jones*, 05 Civ. 7044, 2006 U.S. Dist. LEXIS 22800 *19 (S.D.N.Y. April 25, 2006) ............................... 19

*SEC v. Kearns*, 691 F. Supp.2d 601 (D.N.J. 2010) ....................................................................................... 11

*SEC v. Kelly*, 765 F. Supp.2d 301, 318 (S.D.N.Y. 2011) ............................................................................... 22

*SEC v. Landberg*, 11 Civ. 0404, 2011 U.S. Dist. LEXIS 127827 (S.D.N.Y. Oct. 26, 2011) ............................. 18

*SEC v. Mercury Interactive, LLC*, No. 5:07-cv-02822, 2011 U.S. Dist. LEXIS 134580 *6 (N.D. Cal. Nov. 22, 2011) ...............................................................................................................................................10, 11

*SEC v. Monterosso*, 768 F. Supp.2d 1244, 1269 (S.D. Fla. 2011) ................................................................ 15

*SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970) .....................................................23, 25

*SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 328-29 (S.D.N.Y. 2007) ........................................................ 23

*SEC v. Pentagon Capital Mgmt. PLC*, 08 Civ. 3324, 2012 U.S. Dist. LEXIS 18504 *86 (S.D.N.Y. February 14, 2012) ....................................................................................................................................................... 17

*SEC v. Power*, 525 F. Supp. 2d 415, 423 (S.D.N.Y. 2007) ........................................................................... 26

*SEC v. Ramoil Mgmt., Ltd.*, 01 Civ. 9057, 2007 U.S. Dist. LEXIS 79581 *27-30 (S.D.N.Y. 2007) ................... 23

*SEC v. Save the World Air, Inc.*, 01 Civ. 11586, 2005 U. S. Dist. LEXIS 28313 *29 (S.D.N.Y Nov. 16, 2005) 22

*SEC v. Shanahan*, 4:07CV270, 2010 U.S. Dist. LEXIS 2101 *12-13 (E.D. Mo. Jan. 12, 2010) ...................... 19

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998) ............ 23

*SEC v. Tambone*, 550 F.3d 106, 119 (1st Cir. 2008) ................................................................................... 27

*SEC v. Toure*, 790 F. Supp.2d 147, 162 (S.D.N.Y. 2011) ............................................................................. 22

*SEC v. Universal Express, Inc.*, 475 F.Supp.2d. 412, 424 (S.D.N.Y. 2007) ................................................... 23

*SEC v. Verdiramo*, 10 Civ. 1888, 2011 U.S. Dist. LEXIS 101856 (S.D.N.Y. Sept. 9, 2011) ........................... 24

*SEC v. Verdiramo*, 10 Civ. 1888, 2011 U.S. Dist. LEXIS 101856 *32-33 (S.D.N.Y. Sept. 9, 2011) ............... 23

*SEC v. Zwick*, 03 Civ. 2742, 2007 U.S. Dist. LEXIS 19045 *49 (S.D.N.Y. March 16, 2007), *aff'd*, 2008 U.S. App. LEXIS 18699 (2d Cir. Aug. 27, 2008) ..................................................................................................... 14

*Solow v. Conseco, Inc.*, 06-CV-5988, 2008 U.S. Dist. LEXIS 9234 *11 n.8 (S.D.N.Y. Jan. 11, 2008) ............. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ......................................................... 8

*United States v. Treacy*, 08 Cr. 0366, 2008 U.S. Dist. LEXIS 94082 (S.D.N.Y. Nov. 19, 2008) ..................... 13

*Vancook v. SEC*, 653 F.3d 130 (2d Cir. 2011) ............................................................................................. 10

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) .......................................................... 19

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), through its attorneys, submits this memorandum of law in opposition to the Motion to Dismiss filed by Defendants Belmont Partners LLC ("Belmont") and Joseph Meuse ("Meuse") (collectively "Moving Defendants") to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The SEC's Complaint describes a scheme to issue and illegally sell purportedly unrestricted securities of Alternative Green Technologies, Inc. ("AGTI")[1] by defrauding a transfer agent. Contrary to Moving Defendants' assertions, the SEC's Complaint contains detailed factual allegations against Moving Defendants against whom the SEC asserts a claim for aiding and abetting violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(a) and (c) thereunder and separate claims for primary violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

As an initial matter, the Complaint properly alleges a scheme by Mitchell Segal ("Segal") and AGTI under Rule 10b-5(a) and (c). Even if the scheme could be said to relate to misrepresentations made to the transfer agent, the scheme encompassed conduct beyond those misrepresentations. And the conduct alleged, including the backdating and fabrication of documents, was deceptive. While there might be circumstances where backdating is not deceptive, Moving Defendants offer no innocent explanation here. Indeed, the Complaint specifically alleges a deceptive purpose for the backdating and all reasonable inferences that can be drawn from the allegations also indicate a deceptive purpose.

With respect to Moving Defendants' role in the scheme, the Complaint alleges that Moving Defendants knew that the documents that they solicited, drafted, fabricated, and backdated were false and were created so that an attorney they introduced to Segal would issue an opinion letter allowing a transfer agent owned by Meuse to issue shares of AGTI without a restricted legend. The Complaint also alleges that Moving Defendants had a significant financial motive to aid in the fraud as they were paid at

---

[1] While AGTI was known as Niteagle Systems, Inc. ("NGLE") before December 12, 2008, for purposes of simplicity, in responding to the Motion to Dismiss the SEC will refer to the company as AGTI during all periods of time.

least $119,500 from the proceeds of Segal's illicit sales of AGTI stock. Had the restricted legend not been removed, Moving Defendants would not have been paid for their services. The documents attached by Moving Defendants to their memorandum of law demonstrate a further financial motive as Belmont received 3% of AGTI's shares and their assistance in Segal's scheme would enable them to sell their shares as well. The Complaint also sufficiently alleges Moving Defendants wished to bring about the fraud and, as such, were necessary participants. And contrary to Moving Defendants' contention, the attorney who wrote the opinion letter and the transfer agent who issued the stock both relied on the documents solicited, drafted, fabricated and backdated by Moving Defendants. The opinion letter attached to Moving Defendants' motion confirms this to be the case. And to the extent that there is any doubt about the reliance of the attorney and the transfer agent, the issue of their reliance is one of fact that should not be decided in this motion to dismiss.

The SEC has similarly alleged a primary claim against Moving Defendants for violations of Sections 5(a) and (c) of the Securities Act. While these sections prohibit the sale or offer of securities unless a registration statement has been filed with the Commission, the SEC may bring a claim against any necessary participant or substantial factor in that sale or offer. This test does not require that the participant be the prime mover in the offer or sale but only that the participant took steps necessary to the sale or offer that were not so slight that they could be described as *de minimis*. Section 5 is a strict liability statute and no scienter is required. The same acts that demonstrate Moving Defendants' substantial participation in the fraudulent scheme also form the basis of the Section 5 claims.

Finally, Moving Defendants suggest in their memorandum of law that they do not understand the SEC's claims against them; that the allegations are conclusory and do not contain enough particulars about the who, what, where, when or why to enable them to properly defend this action and that the action should be dismissed under Rule 9(b). This is nonsense. The allegations in the Complaint are not conclusory. The Allegations in the Complaint are detailed, particular, and factually supported. For

example, the Complaint alleges each document Moving Defendants fabricated, how those documents were fabricated, when they were fabricated, and why they were fabricated. In addition, during the investigation the SEC Staff met with counsel for the Moving Defendants, provided them with copies of many of the documents that the SEC Staff considered relevant, and invited the Moving Defendants to provide submissions demonstrating why they should not be charged, which they did, making reference to specific documents made available to them. The Moving Defendants fully understand the charges against them and the factual allegations underlying those charges.

For the reasons described herein, the Court should respectfully deny Moving Defendants' motion to dismiss and grant all other necessary relief.

## THE ALLEGATIONS IN THE COMPLAINT

The Complaint alleges that Belmont, a Virginia corporation, is engaged in the business of obtaining and later selling blocks of controlling shares of publicly traded shell corporations for their use in reverse mergers and that Meuse is its founder, president and sole owner. (Complaint ¶¶ 10-11). Belmont holds itself out as a "leading provider of public shell vehicles for use in reverse merger transactions." (Complaint ¶ 24). In or about October 16, 2008, Belmont purchased a controlling block of AGTI. (Complaint ¶ 24). Upon this purchase, Belmont appointed Meuse to be AGTI's sole director. (Complaint ¶ 25). At the same time, Belmont was negotiating the sale of this control block to Segal. (Complaint ¶ 24).

The sale to Segal was completed in November 2008. (Complaint ¶ 26). Before agreeing to purchase the control block of AGTI, however, Segal insisted that Belmont provide Segal with various documents, including evidence that AGTI owed certain aged debt, an assignment purporting to assign the aged debt to another entity, and an affidavit affirming that NGLE had never been a shell company. (Complaint ¶ 27). The only inference that can be drawn from Segal's request is that he intended to seek an exemption from the registration requirements that would allow him to sell unrestricted AGTI shares

3

into the market. Catering to their client's desire, Belmont made repeated requests to AGTI's owner, Sonny Ball, for evidence that AGTI owed aged debt. (Complaint ¶ 29). In response to its requests, Ball sent Belmont a series of cancelled checks purporting to be payments made on behalf of AGTI (Complaint ¶ 29). Ball also provided Belmont with a sham Assignment of Debt executed by Ball purporting to assign this Aged Debt. Belmont provided the assignment to Segal. (Complaint ¶ 33). Belmont also drafted an affidavit which Ball signed affirming that AGTI had never been a shell company (the "Shell Affidavit"). (Complaint ¶ 35). Meuse knew that the Shell Affidavit was false. (Complaint ¶ 45). Meuse was the sole director of AGTI and received financial records showing that AGTI's bank account balance had never exceeded $4,000 and it had no sales prior to Belmont's 2008 purchase. (Complaint ¶ 36). There were no documents evidencing any ongoing operations by AGTI. (Complaint ¶ 36). The stock purchase agreement that Segal executed with Belmont does not refer to AGTI having any ongoing operations. (Complaint ¶ 36). AGTI had no sales, assets or operations. (Complaint ¶ 35).

Meuse's and Belmont's participation in the scheme continued. On or about December 11, 2008, Meuse and Belmont sent Segal a draft corporate resolution that falsely acknowledged a $101,082 debt owned by AGTI and also stated that the debt could be converted into common shares of AGTI at the option of the holder or its assignees. (Complaint ¶ 37). Despite the fact that at this time Segal was the sole director of AGTI, Meuse purporting to act as sole director of AGTI, signed the corporate resolution and backdated it to October 31, 2008. (Complaint ¶ 37). Meuse knew that the corporate resolution was fabricated and backdated. (Complaint ¶ 45). Indeed, Meuse backdated the corporate resolution to conceal Segal's involvement. (Complaint ¶ 50).

On January 26, 2009, Belmont introduced Segal to an attorney and asked that attorney for an opinion letter on AGTI's behalf stating that shares of AGTI could be issued on an unrestricted basis. (Complaint ¶ 45). This introduction confirms Belmont's knowledge of Segal's intent to sell the AGTI shares. In connection with this request, Belmont sent the attorney the false Shell affidavit, the sham

4

assignment of the aged debt, and the fabricated and backdated corporate resolution. (Complaint ¶ 45).

Belmont instructed the attorney that the opinion letter – opining that the shares of AGTI should be

deemed unrestricted and without a restricted legend – should be issued that night and vouched for the

documents, stating that they were succinct and clear. (Complaint ¶ 45). This documentation apparently

was not sufficient for the attorney. Consequently, Belmont, Meuse, and Segal fabricated and backdated

a so-called Restated 6% Convertible Promissory Note (the "Convertible Note"). (Complaint ¶ 46). The

Convertible Note identified the same $101,082 debt and conversion feature contained in the corporate

resolution. However, the Convertible Note contained additional terms (including an interest rate,

payment methods, and an acceleration clause) and purported to be "restated" even though no original

note or other security existed. (Complaint ¶ 46). Drafts of the Convertible Note were emailed between

Belmont and Segal and Meuse's signature was attached to the note with his authorization. (Complaint ¶

46). Moreover, while the Convertible Note was executed on January 26 or 27, 2009, the Convertible

Note purported to be executed on October 31, 2008.

Relying on the sham assignment, the backdated Corporate Resolution, the fabricated and

backdated Convertible Note, and the false affidavit, the attorney issued the opinion letter. (Complaint ¶

48). On January 28, 2009, Segal submitted the notice of conversion, the opinion letter, the restated

convertible note, and the corporate resolution to Pacific Stock and Transfer Company ("PSTC"), AGTI's

transfer agent. PSTC was not a completely independent party. Indeed, its president and majority owner

was Meuse. (Complaint ¶ 11). As President, Meuse knew that PSTC's ordinary business practice was to

rely on the attorney opinion letter without conducting an independent investigation. (Complaint ¶ 43).

In fact, relying on the opinion letter and its review of the corporate resolution and the convertible note,

the transfer agent issued stock certificates containing no restrictive legend. (Complaint ¶ 50).

From February through September 2009, Segal sold shares of AGTI into the market through a company called Janacor Inc., which he controlled. (Complaint ¶ 58). Segal used these funds to pay Belmont at least $119,500 of the money it owed Belmont for the purchase of AGTI. (Complaint ¶ 58).

## ARGUMENT

### I.     STANDARD FOR DISMISSAL UNDER RULE 12(B)

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court should construe the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (applying *Twombly* standard to securities fraud complaint). Therefore, to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich*, 772 F. Supp. 2d 416 (S.D.N.Y. 2010) (quoting *Iqbal*, 129 S. Ct. at 1949). As described in *Burns v. Del. Charter Guar. & Trust Co.* , 10 Civ. 4534, 2011 U.S. Dist. LEXIS 61375, *5 (S.D.N.Y. June 8, 2011), Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."

### II.     THE SEC HAS PROPERLY ALLEGED SCHEME LIABILITY AGAINST SEGAL AND AGTI

The SEC's Complaint in this matter alleges a scheme "to issue and illegally sell purportedly unrestricted securities of AGTI by defrauding a transfer agent." (Complaint ¶ 1). The Complaint alleges

6

that the primary defendants AGTI and Segal engaged in a series of fraudulent activities in connection

with this scheme including obtaining and furnishing false documents to support a legal opinion letter

that ultimately was provided to AGTI's transfer agent by AGTI so that the transfer agent would issue

millions of shares of purported unrestricted AGTI stock in an unregistered offering. (Complaint ¶ 2).

"[T]he language of Section 10(b) and subsections (a) and (c) is quite broad . . . and should be

construed flexibly to effectuate its remedial purposes." *In re Parmalat Sec. Litig.*, 376 F. Supp.2d 472,

501 (S.D.N.Y. 2005). Section 10(b) of the Exchange Act provides that, in connection with the purchase or

sale of securities, it is unlawful for any person, directly or indirectly, "[t]o use or employ ... any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of

investors." 15 U.S.C. § 78j(b). Rule 10b-5(a) provides that it is unlawful "[t]o employ any device,

scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a). Rule 10b-5(c) makes it unlawful "[t]o engage

in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any

person." 17 C.F.R. § 240.10b-5(c). Rules 10b-5(a) and (c) are known as the scheme liability rules.

### A.    The Complaint Alleges Conduct Beyond Misrepresentations

Moving Defendants argue that the SEC has failed to properly allege scheme liability against the

primary defendants in this case, AGTI and Segal. They argue that the SEC has failed to allege any

conduct by the primary defendants beyond their misrepresentations. They also claim that the SEC has

failed to allege any inherently deceptive conduct. Consequently, Moving Defendants claim that the SEC

is trying to bypass the elements necessary to impose misstatement liability under Rule 10b-5 by labeling

the misconduct as a scheme rather than a misstatement. (Moving Br. at p.4). Moving Defendants are

wrong and it is extremely telling that AGTI and Segal – the primary defendants – have entered into a consent judgment with the SEC, clearly understanding the merits of the Complaint against them.[2]

The fact that a defendant's deceptive conduct has a relationship to misrepresentations made by that same defendant or others does not preclude the SEC from asserting scheme liability claims against that defendant. See *In re Alstom SA*, 406 F. Supp.2d 433, 475 (S.D.N.Y. 2005)("Even if a defendant who did not make any statements in connection with a particular fraud may not be held liable for fraudulent misrepresentations under subsection (b), that defendant may still be held liable under subsections (a) and (c) if it is alleged that they participated in scheme that encompassed conduct beyond misrepresentations."); *SEC v. Mercury Interactive, LLC*, No. 5:07-cv-02822, 2011 U.S. Dist. LEXIS 134580 *6 (N.D. Cal. Nov. 22, 2011) ("a defendant may be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Ruled 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations.").   Consequently, regardless whether misrepresentations were made to the transfer agent, defendants' deceptive conduct can form the basis of the scheme claim.  In *Vancook v. SEC*, 653 F.3d 130 (2d Cir. 2011), the Second Circuit Court of Appeals found that defendant's submission of orders after 4:00 pm for execution as the current day's NAV was an implied representation that could form the basis of a claim under Rule 10b-5(b).  At the same time, the Court held that the following deceptive acts could form the basis of a scheme liability claim under Rules 10b-5(a) and (c) even though those acts were directly related to the implied representation:

> Examples of VanCook's deceptive acts cited by the SEC in its opinion include his "secur[ing] a new clearing broker for [Pritchard Capital Partners] knowing that its order entry system, MFRS, provided an opportunity to place orders after 4:00 p.m. and still receive that day's NAV, unlike the Firm's previous clearing broker"; his use of "time-stamped trade sheets to disguise the fact that [his] customers made trading decisions after the close of trading"; and his false assurances to Pritchard that he "had not been allowing customers to place orders after 4:00 p.m. and had never done so."

---

[2] As per the ECF rules, the consent judgment for Segal and AGTI was sent to the orders and judgments clerk by electronic mail on April 3, 2012, but has not yet been entered by the Court.

Id. at 139. The relationship between the misrepresentations in *Vancook* and the deceptive acts is no different from the relationship between Moving Defendants' representations and deceptive acts.

Similarly, in *SEC v. Brown*, 740 F. Supp.2d 148, 171-72 (D.D.C. 2010), a case where the SEC alleged that the company had failed to identify defendant Prince as an officer in public filings, the court held that SEC stated a scheme liability claim against defendant Prince based on his failure to file statements of holdings and transactions in the issuer's securities as required under Section 16(a) of the Exchange Act. In *Mercury Interactive*, an options backdating case, the court held that a defendant's selection of effective grant dates to maximize the personal benefit to the grantees and to prepare the necessary paperwork to effect those grants "encompasses enough conduct beyond the concealment of the compensation expenses to state a viable claim of scheme liability." *Id.* at *6-7. Likewise, in *SEC v. Kearns*, 691 F. Supp.2d 601 (D.N.J. 2010), the SEC alleged that the company engaged in a fraudulent scheme to improve its financial performance by inflating its own bills to the customers. While the scheme allowed the company to make misstatements about its financial performance, the court held that the CFO of the company could be held liable under a scheme liability theory based upon the fact that the CFO knew of the billing scheme, permitted the scheme to continue by implementing inadequate investigations when claims of fraud were made and by affirmatively misleading the company's auditors. In *SEC v. Fraser*, No. CV-09-00443, 2010 U.S. Dist. LEXIS 7038 (D. Ariz. Jan. 28, 2010), the court in an accounting fraud case held that the SEC had alleged that the defendant's "own conduct had a deceptive purpose and effect" where the complaint alleged that the defendant told employees not to write off the company's uncollectible vendor allowance receivables, knowing that this would have a material effect and the company's financial statements. Even though the defendant's conduct was related to the misrepresentations in the public filings, the court held that scheme liability properly was alleged. See also *SEC v. Geswein*, 5:10CV1235, 2011 U.S. Dist. LEXIS 111904 (N.D. Ohio), *adopted, rejected, and modified in non relevant part*, 2011 U.S .Dist LEXIS 111898 (N.D. Ohio Sept. 29,

2011) (court holds that allegations against defendant sufficient to allege scheme liability as to improper use of bill and hold transactions, fraudulent manipulation of reserves, used equipment write-ups, and improper capitalization of reserves, even though these actions all related to the representations made in periodic filings and disseminated to investors). These cases all make clear that the SEC has properly alleged conduct beyond misrepresentations against the primary defendants in this case.[3]

### B.   The Complaint Alleges Inherently Deceptive Conduct

Moving Defendants also argue that there was nothing unlawful or inherently deceptive about the conduct alleged and, in fact, state that backdating serves a number of legitimate purposes. (Mov. Br. at p. 13 "the courts and commentators have recognized that backdating can be legitimate under certain circumstances"; Mov. Br. at p. 23 "there is nothing inherently wrong with backdating; indeed, it serves a number of legitimate purposes"). Moving Defendants, however, do not provide any legitimate reason why any of the documents in this case were backdated. And contrary to Moving Defendants' assertions, the Complaint does not simply allege that the documents were backdated. The Complaint specifically states why those documents were backdated.  As alleged in the Complaint, the corporate resolution was backdated to the time period when Meuse was a director "in order to conceal" the fact that the terms had been dictated by Segal. (Complaint ¶ 50). Likewise, the timing of the drafting of the restated convertible note and the backdating of that document demonstrate that it was created to deceive. As the Complaint makes clear, the restated promissory note was signed on January 26 or 27, immediately after the attorney was engaged to write the opinion letter. The timing suggests that the document was created solely for the purpose of having a memorializing document to give the attorney. And the document was backdated in order to deceive the attorney into believing that the document had

---

[3] Courts have recognized in cases involving illegal issuances of stock and pump and dump schemes that the conduct inherently is a scheme. *See SEC. v. Drucker*, 76 Civ. 2643, 1983 U.S. Dist. LEXIS 13442 (S.D.N.Y. Sept. 26, 1983) (describing plan to evade Rule 144 that had been "engineered and controlled by the defendant" as scheme, device or other artifice to defraud).

always existed. The fact that the document was titled "restated" also suggested to the attorney that this document had been in existence for a long period when in fact it was recently created.

As the "authority" cited by Moving Defendants makes clear, "the propriety of backdating ... depends on its purpose and effect." Jeffrey L. Kwall & Stewart Duhl, Backdating, Business Lawyer 1 (2008). The reasonable inference that can be drawn from the complaint is that these documents were created to give a false and deceptive appearance that there was a security that had been held by an unaffiliated company for longer than one year in order to enable a lawyer to issue an opinion letter that the AGTI securities could be issued without restriction. Under similar circumstances, courts have held that backdating was deceptive. *In United States v. Treacy*, 08 Cr. 0366, 2008 U.S. Dist. LEXIS 94082 (S.D.N.Y. Nov. 19, 2008), the defendant moved for dismissal of the government's scheme liability claims that were based upon the defendant's backdating option grants. The defendant argued that the granting of in the money options was entirely legal and therefore could not be viewed as acts of deception. The court disagreed, stating "[i]f the activity in question amounts to a scheme to deceive, irrespective of its legality, it may be violative. And while backdating is not necessarily illegal, it is not an inherently innocent act either." The court denied the motion to dismiss.

> a reasonable jury could deem Treacy's alleged conduct deceptive; by allegedly backdating the grants to obtain stock options at historically low prices while giving the appearance that such grants had been given at fair market value on the date of the grant, Treacy may have taken advantage of Monster's shareholders' and the investing public's false belief that the company was in better financial health that it genuinely was. Put simply, the government alleges that Monster's management engaged in a racket whose ingenuity depended on obscurity and subterfuge to manipulate share prices. Thus, the allegations against Treacy encompass conduct that extends beyond misrepresentations or omissions ....

Because the conduct alleged in the Complaint against Moving Defendants – the backdating and the fabrication of documents – was inherently deceptive, it can serve as the basis of a scheme liability claim.

III.   **MOVING DEFENDANTS AIDED AND ABETTED THE SCHEME**

A.   **Moving Defendants Substantially Assisted the Fraud**

A defendant substantially assists a primary violation of Rule 10b-5 if the defendant's conduct is a substantial causal factor in the perpetration of the underlying fraud. *See SEC v. Zwick*, 03 Civ. 2742, 2007 U.S. Dist. LEXIS 19045 *49 (S.D.N.Y. March 16, 2007), *aff'd*, 2008 U.S. App. LEXIS 18699 (2d Cir. Aug. 27, 2008), citing Rolf *v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38, 48 (2d Cir. 1978). As the Second Circuit Court of Appeals has stated, aiders and abetters "associate themselves with the venture, participate[] in it as something they wished to bring about, and s[eek] by their action to make it succeed." *IIT v. Cornfeld*, 619 F.2d 909, 925 (2d Cir. 1980). The Complaint alleges that Moving Defendants substantially assisted the fraudulent scheme to have the transfer agent issue unrestricted stock of AGTI by: (1) drafting an affidavit signed by the former owner of AGTI, which falsely affirmed that AGTI had never been a shell company; (2) drafting, fabricating, signing and backdating a corporate resolution purporting to establish that the aged debt was a pre-existing security with a convertible feature; (3) informing the attorney who was engaged to write an opinion letter that the supporting documentation was succinct and clear and that the opinion letter had to be issued that night; and (4) fabricating and backdating a restated convertible note with terms that never existed and when no original note or other security ever was in place. The Complaint further alleges that such documentation was required to obtain the opinion letter. And that the opinion letter as well as the underlying false documentation was reviewed by the transfer agent and was relied upon in issuing stock certificates for shares of AGTI stock that contained no restrictive legend. As such, the Complaint alleges that the Moving Defendants participated in the fraud as something they wished to bring about and sought by their actions to make it succeed. Courts have regularly found that similarly acting defendants have substantially assisted the fraud. *See, e.g., SEC v. Apolant*, 411 F. Supp.2d 271, 277-78 (E.D.N.Y. 2006) (by writing that the company was based out of Hauppague, NY, the defendant provided

12

substantial assistance to the scheme of concealing true controlling force behind company); *SEC v. Monterosso*, 768 F. Supp.2d 1244, 1269 (S.D. Fla. 2011) (defendants substantially assisted fraud by providing fictitious invoices and CDRs which resulted in material misstatements); *SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1995), *cert denied*, 522 U.S. 813 (1997) (editing documents lends substantial assistance).

Without citing a single factually analogous case, Moving Defendants state that their actions were not a substantial causal factor in the perpetration of the underlying fraud by boldly asserting that contrary to the allegations in the Complaint, "neither the attorney who wrote the Rule 144 opinion nor the transfer agent relied upon" the documents the SEC claims were fabricated. In support of this argument, Moving Defendants attach the attorney's opinion letter. The opinion letter, however, supports the SEC's claim that Moving Defendants substantially assisted the fraud. The letter opines that AGTI could use free-trading shares because the indebtedness reflected in the restated convertible promissory note had been held beyond the one-year requirement set forth in Rule 144 of the Securities Act of 1933. Because this indebtedness was critical for the opinion, the letter, in its very first paragraph, specifically describes that indebtedness and the all-important "Restated Note" that Moving Defendants and Segal fabricated either that very day or the day before:

> Reference is made to that certain indebtedness of the Company incurred between February 2006 and April 2006 ("the Indebtedness Date") in an amount totaling $101,802.00 (the "indebtedness"), which indebtedness was purchased by Noteholder from the original owner thereof (the "Original Holder") and further evidenced in that certain restated convertible promissory note (the "Restated Note") in the amount of the Indebtedness in favor of Noteholder. A copy of the Restated Note is attached to those certain minutes of a meeting of the Board of Directors (the "Board") of the Company where the Board, on behalf of the Company, reaffirmed the Indebtedness entered into by Niteagle Systems, Inc., the predecessor to the Company as debtor.

The importance of these documents to the attorney – both the restated note as well as the board of directors minutes – is further described in the opinion letter, which provides that "[w]e have relied on the Company's assurances that the referenced indebtedness is genuine ...." The opinion letter further states that it was subject to the following assumptions, exceptions, and qualifications: "(a) We have

assumed that (i) all information in **all documents reviewed by us** is true and correct ... and (v) each natural person signing any document reviewed by us had the legal capacity to do so." (emphasis added).

In addition to the indebtedness reflected in the restated note and the board minutes, the opinion letter also relied on the representations of the shareholder (in the shell affidavit) and AGTI that AGTI "has been and continued to be an operating entity such that the Company has never been a 'shell company' within the meaning of 'shell company' as defined by the staff of the Securities and Exchange Commission ('SEC') in SEC Release 33-8587." And the opinion letter also relied on the assurances that neither the Original Holder nor the Holder were affiliates of AGTI. The Opinion Letter, therefore, confirms the allegations in the Complaint that the attorney relied upon the fake documents, which were prepared with the substantial assistance and participation of Moving Defendants.

Similarly, the Complaint alleges that in issuing the stock certificates for AGTI without any restrictive legend, the transfer agent reviewed and relied upon the opinion letter (which was based on the underlying falsehoods) and reviewed the corporate resolution and the convertible note. Moreover, the Complaint alleges that the transfer agent relied on the legal opinion without conducting any independent investigation. Consequently, the transfer agent necessarily relied upon the veracity and authenticity of the documents and representations that served as the basis for the opinion letter.

Moving Defendants argue that the fact that only "reference" is made to certain documents in the opinion letter and that the transfer agent only "reviewed" certain documents means that these individuals did not actually rely on them. The SEC disagrees with Moving Defendants' characterization and believes that the Complaint's allegations and the opinion letter itself sufficiently demonstrate reliance by the lawyer and the transfer agent on the false documents drafted, fabricated, and backdated by Moving Defendants. The point is immaterial, however, because a reasonable inference that can be drawn from the Complaint's allegations is that they did in fact rely on those documents and that is sufficient for purposes of defeating the motion to dismiss. Indeed, reliance is generally an issue of fact

14

that cannot be decided on a motion to dismiss and should be left for trial. *See Solow v. Conseco, Inc.*, 06-CV-5988, 2008 U.S. Dist. LEXIS 9234 *11 n.8 (S.D.N.Y. Jan. 11, 2008) (questions of reasonable reliance 'raise issues of fact that often make them unsuitable for determination on a motion to dismiss'") *Meisel v. Grundberg*, 651 F. Supp.2d 98, 118 (S.D.N.Y. 2009) ("reasonable reliance is largely an issue of fact"); *MTV Networks v. Curry*, 876 F. Supp. 202, 207 (S.D.N.Y. 1994) ("Questions of the reasonableness of reliance raise issues of fact that must be resolved at trial").

**B.      Moving Defendants Misstate the Scienter Requirement**

Moving Defendants argue that in the second circuit aiding and abetting requires the SEC to prove "actual knowledge" of the primary defendants' fraud and that recklessness will not suffice. (Mov. Br. at 6-8). Based on this misleading statement of law, Moving Defendants appear to argue that by using the terminology "knew or should have known" in several paragraphs of its complaint, the SEC is attempting to "evade its heavy burden" either by inappropriately applying a recklessness standard or by improperly attempting to apply Section 9290 of the Dodd- Frank Act retroactively. Moving Defendants, however, do not cite a single decision of the Second Circuit Court of Appeals for the proposition that recklessness cannot suffice for aiding and abetting liability. And while the SEC acknowledges that there are district court decisions in this circuit holding that actual knowledge is the standard for scienter in aiding and abetting case (some of which are cited in Moving Defendants' memorandum of law), there are also recent district court cases that hold that recklessness is sufficient. Indeed, ten days before Moving Defendants filed their motion to dismiss, Judge Sweet in *SEC v. Pentagon Capital Mgmt. PLC*, 08 Civ. 3324, 2012 U.S. Dist. LEXIS 18504 *86 (S.D.N.Y. February 14, 2012), wrote "[t]he Commission need only prove extreme recklessness to establish aiding and abetting liability." (*citing Graham v. SEC*, 222 F.3d 994, 1004-05 (D.C. Cir. 2000)). Similarly, in *SEC v. Gabelli*, 08 Civ. 3868, 2010 U.S. Dist. LEXIS 27613 *24 (S.D.N.Y. March 17, 2010) (DAB), *rev'd on other grounds*, 653 F.3d 49 (2d Cir. 2011), this Court denied a defendant's motion to dismiss the SEC's aiding and abetting claims, including aiding and

15

abetting Section 206(1) of the Investment Advisors Act,[4] stating that "Plaintiff adequately pleads that

Defendant Gabelli knew or was reckless in not knowing of Gabelli Funds' violation of the Investment

Advisers Act . . . ."   In *SEC v. Landberg*, 11 Civ. 0404, 2011 U.S. Dist. LEXIS 127827 (S.D.N.Y. Oct. 26,

2011), the defendant argued that the SEC's allegations of scienter with respect to aiding and abetting

were insufficient.  Like in this case, the defendant "assert[ed] that the SEC is trying to apply retroactively

a recklessness standard adopted in the Dodd-Frank . . . Act of 2010."  The court rejected this argument,

holding that "[t]he scienter standard in this Circuit included recklessness prior to Dodd Frank."  *Id.* at

*22.[5]  Based on these cases, the SEC sufficiently alleges scienter through its allegations of recklessness.

   **C.**      **The SEC has Properly Pled Scienter Even if Reckless Conduct is not Sufficient[6]**

          While Moving Defendants focus on the language "knew or should have known" in the

Complaint, the Complaint is very clear that Moving Defendants had actual knowledge sufficient to hold

them liable for aiding and abetting the fraud claims even if the standard precludes recklessness.

Paragraph 45 of the Complaint specifically states that Meuse "knew" that the shell affidavit was false

and "knew" that the corporate resolution was fabricated and backdated.  The Complaint also provides

the basis for this knowledge.  Meuse was the sole director of AGTI after its purchase from Ball and

received financial records showing that AGTI's bank account balance had never exceeded $4,000 and it

had no sales prior to Belmont's purchase.[7]  AGTI unquestionably was a shell company without

operations.  Indeed, Belmont is a provider of "shell companies."  Meuse also knew that the corporate

resolution related to the aged debt was backdated because he signed the document in December but it

was dated to October 31.  Do Moving Defendants seriously contend that Meuse was somehow unaware

---

[4] Section 206(1), like Section 10(b) is a scienter based claim.

[5] While Moving Defendants discuss the *Landberg* decision in a footnote to their memorandum of law, their only argument is to state that it was based on a "mistaken conclusion."  (Mov. Br. at p. 7, n.6).

[6] While Moving Defendants make a separate argument that the SEC's scienter allegations do not satisfy the requirements of Rule 9(b), the same facts that are described in this section of the SEC's memorandum of law demonstrate that Rule 9(b)'s requirements have been met.

[7] Moving Defendants response is that Meuse was only a director for 20 days, implying either that he did not review the documents provided to Belmont or that he should not be held responsible for anything that happened during this short period of time.  Either way, these are factual arguments that are not appropriate on a motion to dismiss.

of the correct date? In fact, the Complaint specifically alleges that Meuse backdated the document to conceal the fact that Segal had dictated the terms. (Complaint at ¶ 50). And as the sole director of AGTI in October 2008, there is no question that Meuse knew that no board meeting took place while he was director where the debt was acknowledged or where the terms of such debt were discussed and memorialized. Consequently, Meuse knew that entire corporate resolution was fabricated. Moreover, as PSTC's president and majority shareholder, Meuse certainly knew PSTC's business practices, which were to require a legal opinion approved by the issuer stating that the requested shares could be issued on a restricted basis, and that PSTC would rely on that legal opinion without any independent investigation. (Complaint ¶ 43).

The fact that Moving Defendants provided substantial assistance to the fraud and backdated documents without any business justification for doing so also demonstrates their scienter. As courts in this circuit and elsewhere have held, there is a nexus between the degree of knowledge and substantial assistance. *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009); *SEC v. Aragon Capital Advisors*, 07 Civ. 919, 2011 U.S. Dist. LEXIS 82531 *53 N.17 (S.D.N.Y. July 26, 2011) (same); *SEC v. Jones*, 05 Civ. 7044, 2006 U.S. Dist. LEXIS 22800 *19 (S.D.N.Y. April 25, 2006) (same). Consequently, if the transaction is atypical or lacks business justification it may be possible to infer the knowledge necessary for aiding and abetting. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975); see also *SEC v. Shanahan*, 4:07CV270, 2010 U.S. Dist. LEXIS 2101 *12-13 (E.D. Mo. Jan. 12, 2010) ("a party who engages in atypical business transaction of actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge") (citing *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)).

The SEC has also alleged facts demonstrating motive and opportunity to commit the fraud. And the documents referred to in the Complaint (which Moving Defendants have attached to their memorandum of law) make Moving Defendants' motive to assist the fraud even more clear. Moving Defendants argue in their memorandum of law that to properly plead knowledge, the SEC must allege

17

facts showing that the defendants had motive or opportunity to commit fraud. Moving Defendants

claim that the SEC cannot demonstrate motive or opportunity since it has not alleged that they sold

AGTI stock or received the proceeds of the stock sales by Segal or the other defendants. This statement

is simply false. Paragraph 58 of the Complaint specifically states that from February through September

2009, Janacor – a company controlled by Segal – sold AGTI shares into the public market and that Segal

used the proceeds of the sale to pay Belmont at least $119,500 of the money it owed Belmont for the

purchase of AGTI. Indeed, it appears from the documents Moving Defendants appended to their motion

to dismiss that the parties always intended for Belmont to be paid from the proceeds of sales of AGTI

stock.[8] Exhibit A to the motion is a document entitled "Common Stock Purchase Agreement"[9] ("SPA").

Section 3 of the SPA entitled "payment terms" contemplates that payment for the shares of AGTI by a

Segal controlled entity would take place over a six month period. (Ex. A at p. 4 of 21). It is reasonable to

infer that the six-month payment period was created so that Segal could pay Belmont as he sold his

shares of AGTI into the market. Based on the foregoing, Belmont's and Meuse's financial incentive to

aid the fraud is clear – their ability to get paid would depend on Segal's ability to have the restricted

legend removed, allowing him to sell his shares. And, in fact, Belmont ultimately was paid at least

$119,500 from Segal's sales of AGTI stock.

  The SPA provides further financial incentive for Moving Defendants to aid and abet the fraud.

Pursuant to the terms of the agreement, Belmont received 3% of AGTI's issued and outstanding

common stock. (Ex. A at p. 2 of 21). Moving Defendants had an incentive to participate in the fraud

because that would enable them to sell their own shares of AGTI. Indeed, the SPA provides that AGTI

---

[8] As Moving Defendants state in their memorandum of law, in deciding a motion under Rule 12(b)(6), the Court
may consider documents appended to the complaint or documents incorporated by reference therein. (Mov. Br.
at p. 11, n.11).
[9] For purposes of this motion, the SEC will presume that Exhibit A is a true and correct copy of the Stock Purchase
Agreement and will quote from the language of the document provided by Moving Defendants. The SEC notes,
however, that the document does not contain a complete signature page and is also missing an exhibit. The SEC
reserves all rights to argue at a later point, that another version of this document is the true and correct copy.

would "accept as valid any legal opinion of [Belmont's] counsel regarding the removal of restrictions from the Position." (Ex. A at p. 5 of 21). In light of the Complaint's allegations that Belmont introduced the attorney who wrote the opinion letter to Segal, it is reasonable to infer hat any information and assistance or documents that Moving Defendants provided to this lawyer could and would be used to removed restrictions from any shares held by Belmont. Because aiding and abetting Segal's and AGTI's fraud would ultimately assist Belmont to sell its own shares, there was a significant financial motive for Moving Defendants to aid and abet the efforts to remove the restricted legend.

In addition, the SPA provides further economic motivation specifically for Meuse to aid and abet the fraud. As per the agreement, until the time that Belmont had been paid in full, PSTC (owned in the majority by Meuse) would serve as AGTI's sole transfer agent and had full power and authority to act on AGTI's behalf concerning the issuance, transfer, exchange, and replacement of all of the company's stock certificates. As the Complaint alleges, Segal gave repeated instructions to PSTC to issue stock certificates, to cancel stock certificates, and to reissue stock certificates. PSTC received fees in connection with all of these transactions, providing further incentive for Meuse to aid and abet the fraudulent scheme, which resulted in the removal of the restrictive legend from the AGTI shares and allowed all of these fee-generating transactions to take place.

Moving Defendants argue that any inferences of scienter from their conduct are negated by the fact that the fraud was perpetrated on the transfer agent owned by Meuse. Why, according to Moving Defendants, would Meuse defraud his own company? Moving Defendants conveniently ignore the fact that the fraudulent scheme was not intended to and did not, in fact, injure the transfer agent in any way. This is not a situation that "defies economic reason." To the contrary, as stated above, the transfer agent stood to benefit financially as it would receive transaction fees as Segal issued, cancelled,

and reissued AGTI stock certificates.[10] Indeed, the only parties that suffered tangible financial damage from the fraud were the investors who bought AGTI shares that never should have been issued without a restricted legend.

With respect to the false shell affidavit, Moving Defendants argue that they are not lawyers and therefore cannot be held to know or understand the complicated legal definition of a "shell company." Consequently, even if the shell affidavit was false, they claim that they did not have the requisite scienter. This argument rings hollow, however, given that Belmont's core business is to obtain and later sell blocks of controlling shares of publicly traded shell corporations for their use in reverse mergers. Indeed, Belmont holds itself out as a "leading provider of public shell vehicles for use in reverse merger transactions." And Meuse is not only Belmont's founder, president, and sole owner, but he is also the president and majority owner of PSTC, the transfer agent. At this stage of the litigation the only reasonable inference to be drawn from Complaint's allegations is that Belmont and Meuse fully understood the definition of a shell corporation. Indeed, it would probably come as a great surprise to their customer base that Moving Defendants are now disclaiming knowledge of the definition of a shell company. In a similar vein, Moving Defendants argue that because Segal was a "practicing licensed attorney" and prepared or reviewed some of the documents any inference that Moving Defendants knew or should have know that those documents were fraudulent should be negated. Of course, Segal was not an independent attorney engaged for the purposes of reviewing or opining on documents. He was an interested party and, as Moving Defendants knew, was motivated by his desire to remove the restricted legend so he could sell unrestricted shares of AGTI into the market.[11]

---

[10] The SEC, of course, does not have to allege that the defrauded party suffered any injury. *See, e.g., SEC v. Toure*, 790 F. Supp.2d 147, 162 (S.D.N.Y. 2011); *SEC v. Kelly*, 765 F. Supp.2d 301, 318 (S.D.N.Y. 2011); *SEC v. Save the World Air, Inc.*, 01 Civ. 11586, 2005 U. S. Dist. LEXIS 28313 *29 (S.D.N.Y Nov. 16, 2005).

[11] For a similar reason, the fact that the SPA contains Segal's representation that he has experience purchasing development stage companies cannot serve as a basis for Moving Defendants to claim that they believed that AGTI was anything but a shell corporation.

**IV.   THE COMMISSION HAS PROPERLY ALLEGED SECTION 5 CLAIMS**

In addition to its aiding and abetting claims, the Commission asserts primary claims against

Moving Defendants based on Sections 5(a) and (c) of the Securities Act.  Section 5(a) of the Securities

Act prohibits the sale of securities unless a registration statement is in effect.  Section 5(c) of the

Securities Act prohibits the offer to sell securities unless a registration statement has been filed.

In order to establish a violation of Section 5 of the Securities Act, the Commission must show

that:  (1) no registration statement was filed or in effect as to the securities; (2) the defendant, directly

or indirectly, sold or offered to sell the securities; and (3) the offer and sale was made through the use

of interstate facilities or the mails.  *SEC v. Opulentica, LLC,* 479 F. Supp. 2d 319, 328-29 (S.D.N.Y. 2007)

(citing *SEC v. Cavanaugh,* 445 F.3d 105, 111 n.13 (2d Cir. 2006).  No showing of scienter is required.  *SEC*

*v. Softpoint, Inc.,* 958 F. Supp. 846, 859 (S.D.N.Y. 1997), *aff'd,* 159 F.3d 1348 (2d Cir. 1998).  Section 5 is a

strict liability statute.  *SEC v. Ramoil Mgmt., Ltd.,* 01 Civ. 9057, 2007 U.S. Dist. LEXIS 79581 *27-30

(S.D.N.Y. 2007).

Liability under Section 5 does not require that the defendant offer or sell securities.  *SEC v.*

*Verdiramo,* 10 Civ. 1888, 2011 U.S. Dist. LEXIS 101856 *32-33 (S.D.N.Y. Sept. 9, 2011). It is sufficient that

the defendant "was a 'necessary participant' or 'substantial factor' in the illicit sale."  *Id.*  The "necessary

participant" test "asks whether, but for the defendant's participation, the sale transaction would not

have taken place."  *SEC v. Universal Express, Inc.,* 475 F.Supp.2d. 412, 424 (S.D.N.Y. 2007).  To qualify as

a "substantial factor," a defendant need not be a "prime mover[]" but only be shown to have "tak[en]

'steps necessary to the distribution' that [were] not so slight that [they] could be described as *de*

*minimis*."  *SEC. v. N. Am. Research & Dev. Corp.,* 424 F.2d 63, 81 (2d Cir. 1970).  While we do not agree

with Moving Defendants contention that "substantial participation is a concept without precise bounds"

(Mov. Br. at p. 19), it is clear that the bounds encompass Moving Defendants' conduct here.

21

There are numerous cases where courts have found violations of Section 5 based on conduct similar to that of Moving Defendants. In *SEC v. Spongetech Delivery Systems, Inc.*, 10-CV-2031, 2011 U.S. Dist. LEXIS 26146 *25 (E.D.N.Y. March 14, 2011), for example, the court held that the CEO and COO of the company were necessary participants and substantial factors in the unregistered offerings because they made false representations to the transfer agent that caused the shares to be freely tradable. As the court stated, "the SEC has demonstrated a strong likelihood that Moskowitz violated Securities Act Section 5 because he obtained the opinion letters and misrepresented the relevant facts in order to facilitated the distributions." *Id.* at *31. In *SEC v. Boock*, 09 Civ. 8261, 2011 U.S. Dist. LEXIS 95363 *49-50 (S.D.N.Y. Aug. 25, 2011), the court held that defendant "was a substantial factor and necessary participant" where he, *inter alia*, found the purchaser for the shell companies, filed paperwork on behalf of the companies, and served as the president, CEO, and director of the transfer agent for the companies because "without [these actions], the defendants would not have had control of the companies or have found a market to which they could sell securities". Similarly, in *SEC v. Czarnick*, 10 Civ. 745, 2010 U.S. Dist. LEXIS 125463 (S.D.N.Y. Nov. 29, 2010), the court found that the Complaint sufficiently alleged that defendant was a necessary participant and substantial factor where he helped the issuers complete reverse mergers into formerly publicly traded shares, helped draft documents, and transferred documents to the transfer agents. Likewise, in *SEC v. Verdiramo*, 10 Civ. 1888, 2011 U.S. Dist. LEXIS 101856 (S.D.N.Y. Sept. 9, 2011), the court held that one defendant was a necessary participant because he signed a corporate resolution and retained an attorney to write an opinion letter. See also *SEC v. Greenstone Holdings, Inc.*, 10 Civ. 1302, 2012 U.S. Dist. LEXIS 44192 * 33 (S.D.N.Y. March 28, 2012) (holding that general counsel who wrote and approved opinion letters without which the company would not have issued any unregistered shares can be held liable under Section 5).

Moving Defendants incredibly argue that they cannot be held to have been necessary participants in the offer or sale because the Complaint does not allege that they knew about the transfer agent's issuance of stock. This argument completely ignores the allegation that Belmont introduced Segal to an attorney for the purpose of issuing an opinion letter so that free-trading stock could be issued. For what other purpose would such an opinion letter be used except to facilitate the issuance of stock? This allegation also ignores that Meuse was the President of PSTC. Likewise, as stated above, Moving Defendants' argument that they did not know or benefit from the sales is belied by the allegation that Segal paid Belmont $119,500 with the proceeds of his AGTI stock sales. As alleged in the Complaint, Meuse and Belmont each acted as a "necessary participant" or "substantial factor" in the unregistered offering because without them no stock sales would have been possible. Meuse directed Belmont employees to collect "aged" debt, draft and execute the Convertible Note, and draft, and caused Ball to execute, the Assignment and the Shell Affidavit. Meuse executed the backdated Corporate Resolution adopting the debt and its conversion feature. Without these documents, which Belmont sent to the attorney it selected to draft the opinion letter – with the vouchsafe that "all documentation is succinct and clear" – the sales would not have been possible. Furthermore, Meuse was aware that the purpose in documenting "aged" debt and creating documentation for a Convertible Note and Assignment was to gain the ability to have purportedly unrestricted shares issued. These actions are more than sufficient for Section 5 liability, which can apply even to transactional activities of minor consequence. *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970).

**V.      DEFENDANTS' CLAIM THAT THEY DO NOT UNDERSTAND THE COMPLAINT IS FALSE**

Rule 9(b) of the Federal Rules of Civil Procedure provides additional pleading requirements in fraud cases (including SEC enforcement actions), providing that "(i)n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In *Rombach v. Chang*,

355 F.3d 164, 171 (2d Cir. 2004), the Second Circuit Court of Appeals explained the purpose of Rule 9(b):

The particularity requirement of Rule 9(b) serves to "*provide a defendant with fair notice of a plaintiff's claim*, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." (italics added). Indeed, the primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim. *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990) ("(t)he *primary purpose* of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based") (italics added). *SEC v. Power*, 525 F. Supp. 2d 415, 423 (S.D.N.Y. 2007) (citing *Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, No. 94 Civ. 8301, 1995 WL 608323 *3 (S.D.N.Y. Oct. 16, 1995) ("Rule 9(b) 'is not intended to be an 'insurmountable hurdle for [claimants] to overcome, but was designed to afford defendants fair notice of the fraud alleged against them.'"). "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court." *Bangkok Crafts Corp. v. Capitolo di San Pietro*, 03 Civ. 0015, 2006 U.S. Dist. LEXIS 49161 at *13 (S.D.N.Y. July 18, 2006). "The . . . question is: Do the defendants know what the United States is claiming?" *SEC v. Gold*, 05-CV-4713, 2006 WL 3462103 *3 (E.D.N.Y. Aug. 18, 2006).

Moving Defendants argue that the Complaint is defective because it only states what Belmont did, without any reference to the specific person at Belmont who performed those acts. They claim that the Complaint is a "mystery novel." (Mov. Br. at p. 24). As Moving Defendants state, "[i]f Belmont is to defend itself against the SEC's charges, it must know the 'who, what, when and where' of the conduct deemed by the SEC to constitute aiding and abetting the alleged fraud. The SEC's Complaint keeps all of that a mystery, to the prejudice of Belmont." (Mov. Br. at p. 25). This argument is nonsensical for several reasons. First, Belmont is not a large company. The idea that Belmont is unaware of who performed what tasks at the company relating to AGTI is upsurd. Indeed, Belmont – far more than the

SEC – knows which of its employees performed which acts. For this reason, courts have regularly held that 9(b)'s requirements are loosened in scheme cases because the defendant is in a better position than the SEC to know the details of the scheme. *See, e.g. ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) ("It is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant."); *Berk v. Tradewell, Inc.*, 01 Civ. 9035, 2003 U.S. Dist. LEXIS 12078 *38-39 (S.D.N.Y. July 16, 2003); *SEC v. Burns*, 355 F. Supp.2d 917, 921 (N.D. Ill. 2003) (particulars are not necessary to provide defendants with fair notice of the fraud. "To the extent details are not alleged in the complaint, [defendants] have exclusive control over those precise facts surrounding the fraudulent scheme.").   Second, while the SEC specifically did not name in the Complaint individuals at Belmont who were not being charged with violations of the securities laws, prior to filing the Complaint, the SEC made available to Moving Defendants the documents it relied upon in bringing this action. These documents, including emails, show which Belmont employees were involved in the various transactions described in the Complaint. Moving Defendants, through their counsel, reviewed these documents and submitted a Wells Submission that referred to many of those documents.[12] Consequently, notwithstanding its protestations to the contrary, Belmont understands the claims and is fully capable of defending itself.[13]

---

[12] The SEC does not attach the Wells Submission to this memorandum of law but will provide it to the Court upon the Court's request.

[13] *See SEC v. Tambone*, 550 F.3d 106, 119 (1st Cir. 2008) (noting that strike suit considerations do not apply in SEC enforcement actions), *vacated on other grounds*, 573 F.3d 54 (1st Cir. 2009)

## CONCLUSION

For the reasons set forth herein, the SEC respectfully requests that this Court deny the Motion to Dismiss filed by Belmont Partners, LLC and Joseph Meuse and grant such other relief as appropriate.[14]


Dated:  April 11, 2012                          Respectfully Submitted,


                                       __/s/ Todd D. Brody_____
                                       Todd D. Brody
                                       Senior Trial Counsel
                                       SECURITIES AND EXCHANGE COMMISSION
                                       New York Regional Office
                                       3 World Financial Center
                                       New York, NY 10281

---

[14] Should the Court decide to grant Moving Defendants' motion, Plaintiff respectfully requests the opportunity to amend the Complaint to address any deficiencies identified by the Court.