UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                  :

SECURITIES AND EXCHANGE    :
COMMISSION,
                                    :

          Plaintiff,            :

                                    :

       - against -        :

                                    :

ALTERNATIVE GREEN TECHNOLOGIES, :
INC., MITCHELL SEGAL, BELMONT    :
PARTNERS, LLC, JOSEPH MEUSE,    :
HOWARD BORG, DAVID RYAN, VIKRAM :
KHANNA, and PANASCOPE CAPITAL,  :
INC.,                             :
         Defendants, and    :

                                    :

SIERRA RANGE HOLDING, INC., SENIOR :
CAPITAL SERVICES, INC., LAW OFFICES :
OF MITCHELL SEGAL, P.C., and THOMAS :
RUSSO,                           :

          Relief Defendants.   :
------------------------------------------------------------X

**OPINION AND
ORDER**

**11 Civ. 9056 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

      This Securities and Exchange Commission ("SEC") enforcement

action arises out of the alleged fraudulent issuance of purportedly unrestricted

shares of Alternative Green Technologies, Inc. ("AGTI"). The Complaint alleges

that moving defendants Belmont Partners, LLC ("Belmont") and Joseph Meuse

aided and abetted violations of Section 10(b) of the 1934 Securities and Exchange

Act (the "Exchange Act") and Rule 10b-5(a) and (c) promulgated thereunder (Claim II);[1] and violated Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") (Claim III).  On February 24, 2012, Belmont and Meuse moved to dismiss all claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the following reasons, defendants' motion to dismiss is denied.

## I.    BACKGROUND[2]

AGTI was formerly known as Niteagle Systems, Inc.  ("NGLE").[3] Around October 2008, Belmont, which describes itself as a "leading provider of public shell vehicles for use in reverse merger transactions," contacted NGLE's CEO and controlling shareholder, Sonny Ball, to purchase a controlling block of NGLE from Ball.[4]  Belmont was simultaneously negotiating the sale of the control

---

[1]    The primary defendants in the Section 10(b) claim, AGTI and Mitchell Segal, have entered into a consent decree with the SEC.  *See* Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss by Defendants Belmont Partners, LLC and Joseph Meuse ("Pl. Mem.") at 8.

[2]    Unless otherwise noted, all facts are drawn from the Complaint and are presumed true for the purposes of this motion.

[3]    *See* Complaint ("Compl.") ¶ 8.  AGTI has never registered under the Securities Act.  *See id.*

[4]    *See id.* ¶ 24.

2

block of NGLE from Belmont to Mitchell Segal.[5]  Meuse is the "founder, president and sole owner of Belmont."[6]

On October 16, 2008, Belmont purchased a control block of NGLE and appointed Meuse as the sole director of NGLE.[7]  On November 5, 2008, Belmont sold its controlling share to Segal, who appointed himself sole director.[8] As a condition of purchasing a controlling share in NGLE, Segal demanded from Belmont (1) documents evidencing that NGLE owned certain aged debt, (2) an assignment of the aged debt to another entity, and (3) an affidavit from Ball that NGLE had never been a shell company.[9]

On November 12, 2008, in response to Belmont's requests, Ball provided evidence of the aged debt in the form of cancelled checks purporting to be payments by Equishare Financial, Inc. (an entity solely owned by Ball) on behalf of NGLE.[10]  The Complaint avers that this was not debt that NGLE owed

---

[5]     *See id.*

[6]     *See id.* ¶ 11.

[7]     *See id. ¶* 25.

[8]     *See id. ¶* 26.

[9]     *See id.* ¶ 27.

[10]    *See id.* ¶ 29.

Equishare because Equishare had received value (stock) for the payment.[11]  Ball

also executed an assignment on behalf of Equishare purporting to assign the aged

debt reflected in the cancelled checks (the "Assignment").[12]  The space identifying

"assignee" was left blank.[13]

Sometime after November 12, 2008, Segal caused Janacor, Inc., an

entity he controlled through his business partner Howard Borg, to execute the

Assignment on behalf of Janacor as Assignee to make it appear that the debt was

held by a non-affiliate of NGLE.  In fact, Janacor was affiliated with NGLE

because Borg, the president and sole shareholder of Janacor, was an employee of

NGLE, and had purchased a fifty percent interest in Segal's future income and

equity assets, and Segal directed Janacor's actions.[14]

Ball gave the Assignment to Belmont who gave it to Segal.[15]  In

addition, Belmont drafted and Ball signed a false affidavit saying that NGLE was

---

[11]    *See id.*

[12]    *See id.*  $101,082 of that debt was purportedly incurred in 2006, but at
least $86,500 was simply the purchase price of the NGLE stock.  *See id.*

[13]    *See id.* ¶ 32.

[14]    *See id.* ¶¶ 33-34.

[15]    *See id.* ¶ 33.

never a shell company (the "No Shell Affidavit").[16]

On December 11, 2008, "Belmont sent Segal a *draft* corporate resolution purporting to acknowledge debt owed by NGLE and stating that the debt could be converted into common shares of NGLE stock" (the "Corporate Resolution").[17]  Segal, then the director of NGLE, altered the draft by changing the conversion ratio and the purported execution date to October 31, 2008.[18]  Meuse, who was the director of NGLE on October 31, 2008 signed the document.[19]

On December 12, 2008, Segal changed NGLE's name to AGTI and simultaneously conducted a 1-for-20,000 reverse share split.[20]  On December 23, 2008, AGTI entered into a reverse merger with Reddiform WordWide, Inc.

---

[16]     *See id.* ¶ 35.  The Complaint states that "NGLE was in fact a shell company without any sales, assets, or operations."  *Id.*  The Common Stock Purchase Agreement (SPA) that Segal executed with Belmont does not refer to NGLE having any ongoing operations, nor are there any other documents evidencing ongoing operations by NGLE.  *See id.* ¶ 36.  Both Meuse and Segal, as directors of NGLE, had access to financial records showing that NGLE's bank account balance had never exceeded $4,000 and it had no sales prior to Belmont's purchase of it.  *See id.*

[17]     *Id.* ¶ 37 (emphasis in original).  On January 5, 2009, Segal directed Borg, on behalf of Janacor, to execute a Notice of Conversion, converting the $101,082 into 3,814,415 AGTI shares, just under the 10% of total shares that would make Janacor the presumptive affiliate of AGTI.  *See id. ¶* 41.

[18]     *See id.* ¶ 37.

[19]     *See id.*

[20]     *See id.* ¶ 39.

5

("RWW"), also owned by Segal, causing RWW to control AGTI.[21]  RWW's only asset was a license to sell an insulated concrete form.[22]

AGTI's stock could not be resold to the public if it bore a restrictive legend.[23]  AGTI's transfer agent, Pacific Stock Transfer Company ("PSTC"), required, as a prerequisite to issuing unrestricted stocks, a legal opinion approved by the issuer stating that the requested shares could be issued on an unrestricted basis, and relied on that legal opinion without independent investigation.[24]  Meuse was president and majority owner of PSTC and knew of PSTC's requirements.[25]

In order to obtain this legal opinion AGTI would have to demonstrate that: 1) it had never been a shell company; 2) the proposed recipient of the unrestricted shares was not an affiliate; and 3) the proposed recipient would be in compliance with the requirement that the security had been held for the requisite

---

[21]     *See id.* ¶ 40.

[22]     *See id.*

[23]     *See id.* ¶ 42.  A restricted legend is placed by transfer agents on stock certificates to represent that the shares "(a) have not been registered under the Securities Act; (b) are "restricted" as defined by Securities Act Rule 144; and (c) may not be offered, sold or otherwise transferred except pursuant to an exemption from registration."  *Id.*

[24]     *See id.* ¶ 43.

[25]     *See id.* ¶ 11.

one-year holding period.[26]

On January 26, 2009, an employee of Belmont introduced Segal to an attorney via email and asked the attorney for an opinion letter on AGTI's behalf, to be issued that night.[27]  The Belmont employee sent the No Shell Affidavit, Assignment of aged debt and the Corporate Resolution to the attorney and vouched that the documents were "succinct and clear."[28]  Belmont, Meuse and Segal also "fabricated and backdated a so-called Restated 6% Convertible Promissory Note" (the "Convertible Note"), which Meuse purported to execute on October 31, 2008, when, in fact, it was executed on January 26 or 27, 2009.[29]

Around January 27, 2009, the attorney issued a legal opinion stating that Janacor had held the indebtedness for a period exceeding one year, and stating that he had relied on AGTI's representations that AGTI had never been a shell company and that Janacor was not an AGTI affiliate.[30]  The letter referred to and

---

[26]    *See id.* ¶ 44.

[27]    *See id.* ¶ 45.

[28]    *Id.*

[29]    *Id.* ¶ 46 ( The Convertible Note "identified the same $101,082 debt and the conversion feature contained in the Corporate Resolution, but added an interest rate, payment methods and an acceleration clause – none of which are referred to in the Corporate Resolution.").

[30]    *See id.* ¶ 48

relied upon the sham Assignment, Convertible Note, and Corporate Resolution.[31]

On January 28, 2009, Segal submitted the letter and underlying documents to PSTC, which PSTC reviewed and then issued stock certifications to Janacor.[32]  Subsequently, AGTI's shares were unlawfully distributed and sold at the direction of Segal.[33]  Segal used the proceeds from the sale of shares to pay Belmont at least $119,500 of the money it owed for the purchase of AGTI.

## II.    LEGAL STANDARDS

### A.    12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."[34]  "To survive a motion to dismiss . . . a complaint must contain sufficient factual matter, accepted as true, to 'state a

---

[31]    *See id.*

[32]    *See id.* ¶ 50.  On September 14, 2009 Segal submitted another request to PSTC for issuance of stock certificates without a restrictive legend, which PSTC issued, again relying on an attorney opinion that was based on the same underlying documents, except that the convertible note was new and did not implicate Belmont or Meuse.  *See id.* ¶ 59-61.

[33]    *See id.* ¶¶ 51-58.

[34]    *See also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. Nov. 14, 2011) (quotation marks omitted).

claim to relief that is plausible on its face.'"[35]

The court evaluates the sufficiency of the complaint under the "two-pronged approach" advocated by the Supreme Court in *Ashcroft v. Iqbal*.[36]  *First*, "[a] court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[37]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[38]  *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[39]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[40]  Plausibility requires "more than a sheer possibility that a

---

[35]     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[36]     556 U.S. at 679.

[37]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679.).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[38]     *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[39]     *Id.* at 679.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[40]     *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

defendant has acted unlawfully."[41]

## B.    Heightened Pleading Standards of Rule 9(b)

Federal Rule of Civil Procedure 9(b) establishes "a heightened pleading standard for complaints alleging fraud: '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'"[42]   "Claims of aiding and abetting . . . that sound in fraud must meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b)."[43]

Under Rule 9(b) "'knowledge, and other conditions of a person's mind may be alleged generally.'"[44]   "[C]onclusory allegations of scienter are sufficient" if "there exist[s] a 'minimal factual basis'" giving rise to "'a strong inference of

---

[41]    *Id.* (quotation marks omitted).

[42]    *SEC v. Mudd*, No. 11 Civ. 9202, 2012 WL 3306961, at *4 (S.D.N.Y. Aug. 10, 2012) (quoting *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 632–33 (S.D.N.Y. 2008)).

[43]    *Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*, No. 11 Civ. 2082, 2012 WL 3776367, at *4 (S.D.N.Y. Aug. 31, 2012).  *Accord Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007)  ("As in the context of pleading a primary violation, pleading knowledge for purposes of an aiding and abetting claim [sounding in fraud] requires allegations of facts that give rise to a 'strong inference' of actual knowledge.") (citations omitted).

[44]    *Mudd*, 2012 WL 3306961, at *4 (quoting *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d at 632–33).

fraudulent intent.'"[45]  "A plaintiff claiming fraud can plead scienter 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"[46]

## III.   APPLICABLE LAW

### A.    Aiding and Abetting Under Section 20(e) of the Exchange Act

Section 10(b) of the Exchange Act makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[47]  At the time the alleged violations occurred, Section 20(e) provided that "any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such

---

[45]     *ABF Capital Mgmt v. Askin Capital Mgmt, L.P.*, 957 F.Supp. 1308, 1318 (S.D.N.Y. 1997) (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994) and *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)).

[46]     *Mudd*, 2012 WL 3306961, at *5 (quoting *Lemer v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).

[47]     15 U.S.C. § 78j(b).

provision to the same extent as the person to whom such assistance is provided."[48]

Aiding and abetting liability consists of three elements: "'(1) the existence of a securities law violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted in the primary violation.'"[49]  The Second Circuit recently "clarif[ied]" that in pleading substantial assistance "the SEC is not required to plead or prove that an aider and abettor proximately caused the primary securities law violation."[50]  Rather, the requisite showing is that the defendant "in some sort associated himself with the venture, that the defendant participated in it as in something that he wished to bring about, and that he sought by his action to make

---

[48]    *Id.* § 78t(e).  The Dodd-Frank Financial Reform Act, enacted on July 21, 2010 amended the standard for aiding and abetting to "any person that knowingly *or recklessly* provides substantial assistance to another person in violation of a provision of this chapter."  *Id.* (emphasis added).

[49]    *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2004) (quoting *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 491 (S.D.N.Y. 1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)).

[50]    *SEC v. Apuzzo*, 689 F.3d 204, 213 (2d Cir. 2012).  The panel recognized that *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) may have suggested that the SEC was required to plead that the aider and abettor proximately caused the primary securities law violation, but in fact, the proximate causation language it quoted related to requirements for establishing a primary violation, *not* aiding and abetting.  *See Apuzzo*, 689 F.3d at 213.

it succeed."[51]

## B.    Section 5 of the Securities Act

To prove a violation of Section 5, the SEC must establish three prima facie elements: "(1) [t]hat the defendant[s] directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale."[52]  "Liability for violations of Section 5 extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security issues.'"[53]  The "'necessary participant test . . . essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place" – in other words, whether the defendant's acts were a "substantial factor in the sales transaction.'"[54]

## III.   DISCUSSION

### A.    The Complaint Adequately Alleges Aiding and Abetting Against

---

[51]    *Apuzzo*, 689 F.3d at 212.  *See id.* at 213 ("[T]he appropriate standard for determining the substantial assistance component of aider and abettor liability in an SEC civil enforcement action is the Judge Hand standard set forth above.").

[52]    *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007)

[53]    *Id.* (quoting *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)).

[54]    *Id.* (quoting *SEC v. Murphy*, 626 F.2d 633, 651-52 (9th Cir. 1980)) (alteration in original).

**Belmont and Meuse**

The SEC charges Belmont and Meuse with aiding and abetting violations of Section 10(b) on the ground that they knowingly provided substantial assistance to defendants AGTI and Segal in "obtaining and furnishing false documents (including a sham assignment of debt and a fabricated and backdated corporate resolution and convertible note), to support a legal opinion letter that was provided to AGTI's transfer agent so that the transfer agent would issue millions of shares of purportedly unrestricted AGTI stock in an unregistered offering."[55]

Belmont and Meuse moved to dismiss this claim based on the SEC's failure to adequately allege any of the three requirements of aiding and abetting liability:[56] (1) that AGTI and Segal committed a primary violation of Section 10(b) and Rule 10b-5;[57] (2) that Belmont and Meuse had "actual knowledge" of that primary violation;[58] or (3) that Belmont and Meuse substantially assisted the

---

[55]   Compl. ¶ 2.

[56]   *See SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2004) (quoting *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 491 (S.D.N.Y. 1989) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)) (listing three elements of aiding and abetting liability).

[57]   *See* Memorandum of Law in Support of Defendant Belmont Partners, LLC's and Defendant Joseph Meuse's Motion to Dismiss ("Def. Mem.") at 4-6.

[58]   *See id.* at 6-14.

violation.[59]  I find that the SEC adequately alleged a primary violation by AGTI,
that Belmont and Meuse had actual knowledge of the fraud, and their substantial
assistance in the fraud, thereby stating a claim that they aided and abetted the
violation of Section 10(b).

### 1.     The Complaint Alleges a Primary Violation of the Exchange Act

The primary violation alleged is that Segal and AGTI engaged in a
"scheme" "to issue and illegally sell purportedly unrestricted securities of AGTI by
defrauding a transfer agent" in violation of Rule 10b-5(a) and (c).[60]  Defendants
argue that the SEC "impermissibly seeks to characterize misstatements
unaccompanied by inherently deceptive conduct as a scheme."[61]

"Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges
on the performance of an inherently deceptive act that is distinct from an alleged
misstatement."[62]  This is not, as defendants suggest, a situation "where the primary

---

[59]     *See id.* at 15-18.

[60]     Compl. ¶ 1; *see also* Def. Mem. at 4 (citing Compl. ¶¶ 63-66).

[61]     Def. Mem. at 4.

[62]     *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011).  Rule 10b-5(a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b-5(a).  Rule 10b-5(c) prohibits "engag[ing] in any practice which operates or would operate as a fraud or deceit upon any person."  *Id.* § 240.10b-5(c).

purpose and effect of a purported scheme is to make a public misrepresentation or omission."[63]  Moreover, "[a] defendant can be held liable under subsections (a) and (c) for conduct in one period that gives rise to a misstatement in a later period."[64]

The Complaint alleges *conduct* that was "inherently deceptive when performed"[65] – issuance of false assurances that AGTI was never a shell company and false assurances regarding the aged debt, and fabrication and backdating of the Corporate Resolution (allegedly to conceal the fact that Segal had dictated its terms), and the Convertible Note,[66] all in furtherance of the scheme to issue purportedly unrestricted shares.  The "conduct [itself] had a deceptive purpose and effect"– to obtain the inaccurate legal opinion and secure the issuance of the purportedly unrestricted stock.

The Second Circuit affirmed a finding of "scheme liability" where the

---

[63]     *Kelly*, 817 F. Supp. 2d at 343 (holding that the SEC cannot bypass the elements necessary to impose 'misstatement liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement'").

[64]     *SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (citing *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004)).

[65]     *Id.*

[66]     While backdating is not always illegal, "[i]f the activity in question amounts to a scheme to deceive, irrespective of its legality, it may be violative." *United States v. Treacy*, No. 08 CR 0366, 2008 WL 4934051 (S.D.N.Y. Nov. 19, 2008).

SEC demonstrated that the defendant had "engaged in numerous deceptive acts in furtherance of the deceptive late-trading scheme" including "use of time-stamped trade sheets to disguise the fact that his customers made trading decisions after the close of trading; and [made] false assurances . . . that he had not been allowing customers to place orders after 4:00 p.m."[67]  The allegations here are analogous. Thus, the SEC has adequately pleaded scheme liability as a primary violation.

### 2.   The Complaint Adequately Alleges Actual Knowledge of the Fraudulent Scheme[68]

The Complaint alleges that Meuse, who was founder, president and sole owner of Belmont, "knew" that the Shell Affidavit was false and "knew" that the Corporate Resolution was fabricated and backdated.[69]  Several arguments support those assertions.  With regard to the Shell Affidavit, Meuse was made sole director of AGTI after Belmont purchased the company, and signed a Common Stock Purchase Agreement ("SPA") indicating that AGTI had not conducted any

---

[67]   *VanCook v. SEC,* 653 F.3d 130, 139 (2d Cir. 2011).

[68]   Because I find that the Complaint alleges actual knowledge, I need not address whether recklessness suffices, either under the 2009 version of the Exchange Act, or, retroactively, under the revised current version, which expressly includes recklessness.

[69]   Compl. ¶ 45.

business prior to the purchase by Belmont.[70]  Bank statements and other documents

showed that AGTI had no assets or operations.  Meuse's role as sole director of

Belmont, which advertised itself as a provider of "shell companies," discredits the

argument that "[a]s a nonattorney, Meuse presumably did not know the legal

definition of a 'shell company.'"[71]  Together, these allegations create a strong

inference that Meuse had actual knowledge that AGTI was a shell company.

   With regard to the backdating of the Corporate Resolution and

Convertible Note, it defies logic to suggest that Meuse was unaware that he was

signing backdated documents, particularly in light of the fact that on the day he

signed the documents, he was no longer the director of AGTI.  Meuse also would

have known that no board meeting took place to discuss the contents of the

---

[70] This inference is more compelling than defendants' argument that
"Defendant Segal represented and warranted [in the SPA] that he had 'experience'
as a purchaser in securities of 'developmental stage companies,'" which "'*can* have
planned principal operations' that have 'commenced'" from which it can be
inferred that the parties . . . believed that AGTI so qualified."  Def. Mem. at 11.
*See Tellabs v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 313 (2007) (Plaintiff's
"inference of scienter [must be] cogent and at least as compelling as any plausible
opposing inference one could draw from the facts alleged.").

[71] Def. Mem. at 10.  *See also Kelly*, 765 F. Supp. 2d at 319-320 (denying
summary judgment because defendant's claims that he had "no accounting
background, [did] not understand complex accounting rules, and therefore could
not have known that [the company] was recognizing revenue improperly" left a
material question of fact whether the requirements of aiding and abetting were met
where "the SEC has adduced evidence that [defendant] knew that [the transactions]
were improper").

Corporate Resolution as he was the director of AGTI at the time it allegedly occurred.  This suggests that he knew the backdated Corporate Resolution and Convertible Note were fabricated.  And defendants propose no plausible business justification for the backdating to counteract the SEC's assertion that the purpose was to hide Segal's involvement in the Corporate Resolution.[72]

Finally, as president of PSTC, Meuse would have known that these documents were necessary to procure the issuance of unrestricted stock certificates.  Taken together, all this supports a strong inference of knowledge that the purpose of procuring these fraudulent documents was to "issue and illegally sell purportedly unrestricted securities of AGTI."[73]

### 3.    The Complaint Adequately Alleges Substantial Assistance

The allegations in the Complaint demonstrate that Belmont and Meuse

---

[72]    *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir. 1975) ("[I]f the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability").  *See also SEC v. Washington Co. Utility District,* 676 F.2d 218, 226 (6th Cir. 1982); *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 504 (S.D.N.Y. 1987) (finding it reasonable to infer knowledge and intent from allegations of "participation in atypical financing transactions and the sale, at a discount, of promissory notes among defendants").  *See also Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464-65 (S.D.N.Y. 2009) (knowledge of fraud could be inferred from alleged aiders and abettors' creating false paper trails to minimize appearance of their involvement in scheme).

[73]    Compl. ¶ 1.

"associated [themselves] with the venture" by acting as middlemen in procuring the documents necessary to the issuance of unrestricted shares of AGTI. The SEC has also alleged facts suggesting that defendants "wished to bring about [the scheme to issue unrestricted stock], and . . . sought by [their] action to make it succeed."[74] The shares AGTI sold were used to pay Belmont the money Segal owed for the purchase of AGTI, and the SPA, which provides for payment over six months, supports the inference that "their ability to get paid would depend on Segal's ability to have the restricted legend removed."[75] In addition, the SPA provides that Belmont received three percent of AGTI's issued and outstanding common stock, thus, the scheme's success would allow Belmont to sell its own AGTI stock.[76] Finally, as president and majority owner of PSTC, Meuse stood to benefit from the fees that PSTC received in connection with the issuance, reissuance, and cancellation of AGTI stock certificates.

Contrary to defendants' assertion that "plaintiff's view of the facts

---

[74]   This inquiry is akin to the "motive" inquiry for establishing scienter. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (stating that to allege a strong inference of scienter a plaintiff may either "(a) alleg[e] facts to show that defendants had both motive and opportunity to commit fraud, or (b) [allege] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness").

[75]   Pl. Mem. at 18.

[76]   *See id.*

defies economic reason,"[77] the SEC alleges sufficient motivation to support the inference that defendants had knowledge of the fraud and provided substantial assistance.

### 4. The Claims Against Belmont Are Pled With Sufficient Particularity

Defendants argue that the Complaint failed to plead Belmont's role in the fraud with specificity because it "does not say who at Belmont drafted the [No Shell Affidavit]," and "is replete with similarly generic references to things 'Belmont' did."[78]  Further, defendants object that the Complaint "ascribes knowledge and motive to Belmont, without specifying who knew what and when, and who acted on Belmont's behalf and why."[79]

The purpose of the Rule 9(b) requirement that plaintiffs plead fraud with specificity is to "'ensure that a defendant is informed sufficiently of the allegations against him such that he is in a position to answer the complaint and

---

[77]    Def. Mem. at 9 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (alteration in original)).

[78]    *Id.* at 24.

[79]    *Id.* at 25 (citing Compl. ¶ 38 ("Segal, Belmont, and Meuse all knew, or were reckless in not knowing, that the Corporate Resolution was going to be used as a basis for the transfer agent to issue certificates for AGTI stock without a restricted ledgend.")).

prepare a defense.'"[80]  In furtherance of that objective, a claim of fraud should

generally "connect the allegation[s] . . . to a particular speaker."[81]  Here, however,

defendants do not contend that they are unable to determine "the speakers whose

statements might expose [Belmont] to liability."[82]  Moreover, the Complaint

identifies in detail "the documents and the specific statements within them that

were false or misleading."[83]  For example, the Complaint states: "[o]n January 26,

2009 an employee of Belmont introduced Segal to an attorney via email and asked

the attorney for an opinion letter on AGTI's behalf;" and a "Belmont employee

sent the Shell Affidavit, sham assignment of aged debt and the Corporate

Resolution to the attorney and vouched that the documents were 'succinct and

---

[80]     Def. Mem. at 24 (quoting *McGrath v. Dominican College of Blauvelt*, 672 F. Supp. 2d 477, 485 (S.D.N.Y. 2009)).

[81]     *Wolff Office Equip. Corp. v. Wang Labs., Inc.*, No. 87 Civ. 1498, 1987 WL 26844, at *3 (S.D.N.Y. Nov. 30, 1987) (internal quotation omitted).  *Accord Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004) (Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (internal quotation omitted).

[82]     *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 199 (S.D.N.Y. 2011).

[83]     *Id.* (citing *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 601 (S.D.N.Y. 2008) ("The conclusory allegations contained in these paragraphs are insufficiently particularized under Rule 9(b)  because they do not identify any specific statements made by [Defendant].")).

clear.'"  In light of the specificity with which the Complaint identifies the events in question, I find that Rule 9(b) is satisfied.

### B.    The Securities Act Claims

The SEC also charges Belmont and Meuse with violation of sections 5(a) and 5(c) of the Securities Act, as "necessary participants or substantial factors in the offer and sale of AGTI shares sold to the investing public."[84]  Belmont and Meuse move to dismiss this claim on the ground that "they had no role in the sale or offer of unregistered securities."[85]

Parties who "misrepresent[] the relevant facts in order to facilitate the distributions [of unregistered offerings]" may be liable as necessary participants and substantial factors for violations of Section 5 of the Securities Act.[86]  For the reasons stated above, Belmont and Meuse were a substantial factor in obtaining the attorney opinion letter based on documents that they knew were fabricated or false – the Shell Affidavit, the Corporate Resolution, and the Note.  In addition, Belmont found the purchaser for AGTI, filed paperwork on behalf of AGTI, procured the attorney who issued the opinion for AGTI, and Meuse acted as president of the

---

[84]    Compl. ¶ 72.

[85]    Def. Mem. at 19.

[86]    *SEC v. Spongetech Delivery Sys., Inc.*, No. 10 Civ. 2031, 2011 WL 887940, at *25 (E.D.N.Y. Mar. 14, 2011).

transfer agent. This is sufficient to conclude that they were necessary participants and substantial factors in the unregistered offerings.[87]

## VI.  CONCLUSION

In light of the foregoing, defendants' motion to dismiss is denied. The Clerk of the Court is directed to close the motion to dismiss (Docket Entry # 23). A conference is scheduled for Friday, October 19, 2012 at 5:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 24, 2012

---

[87]     *See, e.g., SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *2-5 (S.D.N.Y. Aug. 25, 2011) (holding that defendant was substantial factor and necessary participant where he, *inter alia*, found the purchaser for shell companies, filed paperwork on behalf of the companies involved in the scheme, and was president, CEO and director of the transfer agencies).

24

**-Appearances-**

**For Plaintiff:**

Todd D. Brody, Esq.
Securities & Exchange Commission
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-0080

**For Defendants Belmont Partners, LLC and Joseph Meuse**

Kirk M. Neste, Esq.
Michael R. MacPhail, Esq.
Faegre Baker Daniels LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203-4532
(303)-607-3580