UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

            Plaintiff,

    - against -

ALTERNATIVE GREEN
TECHNOLOGIES, INC., MITCHELL
SEGAL, BELMONT PARTNERS, LLC,
JOSEPH MEUSE, HOWARD BORG,
DAVID RYAN, VIKRAM KHANNA, and
PANASCOPE CAPITAL INC.,

          Defendants,

SIERRA RANGE HOLDINGS, INC.,
SENIOR CAPITAL SERVICES, INC.,
LAW OFFICES OF MITCHELL SEGAL,
P.C., and THOMAS RUSSO,

         Relief Defendants.

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/15/14

**OPINION AND ORDER**

**11 Civ. 9056 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       In December 2011, the Securities and Exchange Commission ("SEC")

brought this civil enforcement action against, among others, Alternative Green

Technologies, Inc. ("AGTI") and Mitchell Segal (collectively, the "Named

Defendants") alleging various securities violations arising from "a scheme by [AGTI, Segal, and others] to issue and illegally sell purportedly unrestricted securities of AGTI by defrauding a transfer agent."[1]  On April 2, 2012, the Named Defendants consented to the entry of partial judgment against them (the "Partial Judgment").[2]  The Partial Judgment orders the Named Defendants to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [of 1933] . . . and Section 21(d)(3) of the [Securities] Exchange Act [of 1934]."[3]  The Partial Judgment further provides that "[t]he Court shall determine the amounts of the disgorgement and civil penalty upon motion of the [SEC]."[4]

---

[1]        Complaint ("Compl.") ¶ 1.  This Opinion and Order does not implicate the other named defendants in this action.  However, it does implicate some of the relief defendants.

[2]        *See generally* Consent of Defendants Alternative Green Technologies, Inc. and Mitchell Segal, Ex. C to Declaration of Megan R. Genet in Support of Plaintiff Securities and Exchange Commission's Motion for Final Judgment Ordering Disgorgement, Prejudgment Interest and Civil Penalties Against Defendants Alternative Green Technologies, Inc. and Mitchell Segal and Ordering Disgorgement Against Relief Defendants Sierra Range Holdings, Inc., Senior Capital Services, Inc. and Law Offices of Mitchell Segal, P.C. ("Genet Decl.").

[3]        Judgment as to Defendants Alternative Green Technologies, Inc. and Mitchell Segal ("Partial Judgment"), Ex. D to Genet Decl., at 4.

[4]        *Id.* at 5.

The SEC now moves for the entry of final judgment.[5]  In so moving, the SEC seeks disgorgement and prejudgment interest from the Named Defendants.  The SEC also seeks disgorgement and prejudgment interest from relief defendants, Sierra Range Holdings, Inc. ("Sierra Range"), Senior Capital Services, Inc. ("Senior Capital"), and Law Offices of Mitchell Segal ("Law Offices") (collectively, the "Relief Defendants").  Lastly, the SEC seeks maximum civil penalties against the Named Defendants.

For the reasons that follow, the SEC's motion for final judgment is GRANTED.  The Named Defendants are jointly and severally liable for $195,944 (the "Total Amount"), which consists of $165,003 in disgorgement of ill-gotten gains and $30,941 in prejudgment interest.  The Total Amount shall be paid in the following manner:

> (1) The Named Defendants, along with Law Offices, are jointly and severally liable for up to the Total Amount, which consists of $165,003 in disgorgement of ill-gotten gains and $30,941 in prejudgment interest;
> (2) Sierra Range, along with the Named Defendants, is jointly and severally liable for up to $15,990.74 of the Total Amount, which consists of $13,500 in disgorgement of ill-gotten gains and

---

[5]     *See generally* Plaintiff Securities and Exchange Commission's Motion for Final Judgment Ordering Disgorgement, Prejudgment Interest and Civil Penalties Against Defendants Alternative Green Technologies, Inc. and Mitchell Segal and Ordering Disgorgement Against Relief Defendants Sierra Range Holdings, Inc., Senior Capital Services, Inc. and Law Offices of Mitchell Segal, P.C. ("SEC Mem.").

$2,490.74 in prejudgment interest; and

(3) Senior Capital, along with the Named Defendants, is jointly and severally liable for up to $23,867.67 of the Total Amount, which consists of $20,150 in disgorgement of ill-gotten gains and $3,717.67 in prejudgment interest.

Additionally, AGTI is liable for a civil penalty in the amount of $650,000, and Segal is liable for a civil penalty in the amount of $130,000.

## II.    BACKGROUND[6]

AGTI is a publicly traded company with its headquarters in New York.[7]  Segal is the CEO and sole director of AGTI.[8]  Segal is also a licensed attorney in New York.[9]  From September 2008 through September 2009, AGTI and Segal "obtain[ed] and furnish[ed] false documents (including a sham assignment of debt and a fabricated and backdated corporate resolution and convertible note), to support a legal opinion letter that was provided to AGTI's

---

[6]    For the purposes of addressing the SEC's motion, and by consent of the Named Defendants in the Partial Judgment, the Court accepts as true all of the allegations in the Complaint.  *See* Partial Judgment at 5.

[7]    *See* Compl. ¶ 8.

[8]    *See id.* ¶ 9.

[9]    *See id.*  However, Segal, in his declaration in opposition to this motion, states that "[i]n connection with my participation in the transactions that are the subject of this lawsuit, I did not act in any capacity as a lawyer, I was not actively practicing law at the time, and I did not hold myself out to be an attorney in any respect." *See* Declaration of Mitchell Segal ("Segal Decl.") ¶ 3.

4

transfer agent so that the transfer agent would issue millions of shares of purportedly unrestricted stock in an unregistered offering."[10]  Other defendants in this action assisted AGTI and Segal in the execution of this scheme.[11]  The activities of AGTI and Segal constituted violations of (1) sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"); and (2) section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5(a) and (c) thereunder.[12]

## A.   Distribution of the Ill-Gotten Gains

The total proceeds from the sale to the public of the issued AGTI shares was $317,256.77.[13]  Of this total, Law Offices collected $242,353, Sierra Range collected $13,500, Senior Capital collected $20,150, and Segal, personally,

---

[10]     Compl. ¶ 2.

[11]     *See id.* ("Belmont and Meuse *assisted* AGTI and Segal in creating the false, backdated, and fabricated documents and furnishing them to the attorney for use in drafting the opinion letter.") (emphasis added); *id.* ¶¶ 27-28 ("Segal *insisted* that Belmont provide Segal with various documents . . . Segal made these requests to create the basis for the issuance of purportedly unrestricted stock that could then be sold into the public market.") (emphasis added).

[12]     *See id.* ¶ 3.

[13]     *See id.* ¶ 58.  In total, there were fifty-three separate sales of restricted AGTI shares.  *See* Charts Reflecting Gains from Janacor's Illicit Sales of AGTI Stock to Segal and Relief Defendants, Ex. E to Genet Decl., at 2-3.

collected $8,500.[14]  Thereafter, Segal, who is the president and sole shareholder of both Sierra Range and Senior Capital,[15] paid $119,500 to defendant Belmont Partners, LLC ("Belmont").[16]

### B.    The Partial Judgment

Five months after the SEC instituted this action, the Named Defendants consented to entry of the Partial Judgment.  By consenting to the terms of the Partial Judgment, the Named Defendants neither admitted nor denied the allegations in the Complaint.[17]  However, in relation to the SEC's present motion, the Partial Judgment requires the Named Defendants to accept as true all of the allegations in the Complaint, which thereby precludes the Named Defendants from arguing that they did not violate the securities laws.[18]

### C.    Segal's Lack of Cooperation

Despite settling with the SEC and despite this being his first securities

---

[14]    *See* Compl. ¶ 58.

[15]    *See id.* ¶¶ 16-17.

[16]    *See id.* ¶ 58.  Segal had purchased a controlling block of AGTI from Belmont in 2008.  *See id.* ¶ 26.  This payment constituted money "owed [to] Belmont for the purchase of AGTI."  *Id.* ¶ 58.

[17]    *See* Partial Judgment at 1.

[18]    *See id.* at 5.

violation,[19] Segal remained uncooperative.  Segal refused to be deposed and asserted his Fifth Amendment rights in response to questioning.[20]

**D.    SEC Settlements with Other Defendants**

Belmont agreed to pay $119,500 to the SEC — $110,500 in disgorgement and $9,000 in prejudgment interest.[21]  Belmont also paid a civil penalty of $55,500.[22]  Another defendant, Joseph Meuse, who is the founder, president, and sole shareholder of Belmont, agreed to pay a civil penalty of $50,000.

**E.    Financial Condition of the Named Defendants and the Relief Defendants**

**1.    Segal**

---

[19]    *See* Response on Behalf of AGTI, Mitchell Segal, Sierra Range Holdings, Senior Capital Services, and Law Offices to the SEC's Motion for Final Judgment ("AGTI Opp.") at 8.

[20]    *See* Affidavit of Mitchell Segal ("Segal Aff."), Ex. A to Plaintiff Securities and Exchange Commission's Reply Memorandum of Law in Further Support of Its Motion for Final Judgment Against Defendants Alternative Green Technologies, Inc. and Mitchell Segal and Relief Defendants Sierra Range Holdings, Inc., Senior Capital Services, Inc. and Law Offices of Mitchell Segal, P.C. ("SEC Reply"), ¶¶ 3-4.

[21]    *See* Final Judgment as to Belmont Partners, LLC and Joseph Meuse ("Belmont/Meuse FJ"), Ex. C to Declaration of Eric M. Creizman, attorney for the Named Defendants, at 4.

[22]    *See id.*; *see also* Compl. ¶ 11.

In opposition to this motion, Segal submitted a Statement of Financial Condition, a form given to him by the SEC (the "SEC Form").[23]  The SEC Form lists Segal's assets as $44,475, which includes a boat valued at $28,000.[24]  The SEC Form shows Segal's liabilities as $419,030.75.[25]  These liabilities consist of only two line items:  (1) a tax liability of $374,030.75; and (2) a boat loan of $45,000.[26]

However, portions of the SEC Form are incomplete.  For example, when asked to list all his bank accounts since September 2007, Segal only lists Law Office's bank account.[27]  Moreover, Segal does not respond to questions asking for a complete list of disbursements of $1,000 or more made by him from 2007 to the present.[28]  Segal also fails to substantiate his tax liability.

### 2.    AGTI and the Relief Defendants

According to Segal, (1) AGTI is not operational and has no remaining

---

[23]    *See generally* United States Securities and Exchange Commission Statement of Financial Condition ("SEC Form"), Ex. A to Segal Decl.

[24]    *See id.* at 1.

[25]    *See id.* at 2.

[26]    *See id.*

[27]    *See id.* at 4.

[28]    *See id.* at 7.

assets;[29] (2) Sierra Range and Senior Capital are "no longer active, do not conduct business operations, and have no assets[;]"[30] and (3) "Law Offices is merely an extension of Mitchell Segal, and has no assets . . . ."[31]

## III.   APPLICABLE LAW

### A.   Disgorgement

"The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."[32]  "[D]isgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court."[33]  Because disgorgement is an equitable remedy, "[t]he district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."[34] "In determining the amount of disgorgement to be ordered, a court must focus on

---

[29]     *See* Segal Decl. ¶ 4.

[30]     *Id.* ¶ 5.

[31]     AGTI Opp. at 2.

[32]     *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996).

[33]     *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).

[34]     *First Jersey*, 101 F.3d at 1474-75.

the extent to which a defendant has profited from his [violation]."[35]

      "Because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude."[36]  Under Second Circuit law, "'[t]he amount of disgorgement ordered need only be a *reasonable approximation* of profits causally connected to the violation.'"[37]

      "Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"[38]  Defendants are "entitled to prove that the [] measure is inaccurate,"[39] but the "'risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose

---

[35]     *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009).

[36]     *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).

[37]     *SEC v. Contorinis*, 743 F.3d 296, 305 (2d Cir. 2014) (quoting *First Jersey*, 101 F.3d at 1474-75) (emphasis added).

[38]     *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).

[39]     *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994) ("Bilzerian, however, bears the burden of establishing that the price increases that occurred during his ownership of the stocks were attributable to market forces rather than to his violations.")).

illegal conduct created that uncertainty.'"[40]  Ultimately, however, the final decision as to the amount of disgorgement rests with the district court.[41]

"For purposes of calculating disgorgement, financial hardship does not preclude the imposition of an order of disgorgement."[42]  "[W]hether or not the defendant may have squandered and/or hidden ill-gotten profits should not determine the amount disgorged; similarly, the likelihood that the SEC will in fact be repaid is unrelated to the amount by which a wrongdoer was improperly enriched."[43]

"Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement. . . . In such situations, the joint tortfeasors bear the burden of demonstrating that their liability can be reasonably apportioned."[44]

## B.   Prejudgment Interest

---

[40]      *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).

[41]      *See First Jersey*, 101 F.3d at 1474-75.

[42]      *SEC v. Taber*, No. 13 Misc. 282, 2013 WL 6334375, at *2 (S.D.N.Y. Dec. 4, 2013) (quotations omitted).

[43]      *Id*. (quotations omitted).

[44]      *Universal Exp.*, 646 F. Supp. 2d at 563 (citing *First Jersey*, 101 F.3d at 1475; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997)).

The court also has discretion to order payment of prejudgment interest on any disgorged gains.  Requiring the payment of interest prevents a defendant from obtaining the benefit of "'what amounts to an interest free loan procured as a result of illegal activity.'"[45]  "In deciding whether an award of prejudgment interest is warranted, a court should [take into account] . . . considerations of fairness and the relative equities of the award, [] the remedial purpose of the statute involved, and/or [] such other general principles as are deemed relevant by the court."[46]

## C.    Civil Penalty

The Securities Act and the Exchange Act authorize three tiers of civil penalties.[47]  Third-tier penalties are appropriate when two conditions are met: (1) "the [securities] violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; [and (2)] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[48]  "[T]he amount of penalty for each such violation shall not exceed the greater of (I) [$130,000] for a natural person or [$650,000] for any

---

[45]     *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2011 WL 666158, at *3 (S.D.N.Y. Feb. 14, 2011).

[46]     *First Jersey*, 101 F.3d at 1476 (quotations omitted).

[47]     *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

[48]     15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation[.]"[49]

Factors that courts consider in determining whether to impose civil penalties include:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.[50]

"While [] factors [like these] are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate

---

[49]     *Id.*; *see also* 17 C.F.R. § 201.1004.

[50]     *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (citing *SEC v. Kane*, No. 97 Civ. 2931, 2003 WL 1731293, at *4 (S.D.N.Y. Apr. 1, 2003); *SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159, 2002 WL 1968341, at *5 (S.D.N.Y. Aug. 23, 2002); *SEC v. Robinson*, No. 00 Civ. 7452, 2002 WL 1552049, at *10 (S.D.N.Y. July 16, 2002); *SEC v. McCaskey*, No. 98 Civ. 6153, 2002 WL 850001, at *14 (S.D.N.Y. Mar. 26, 2002); *SEC v. Coates*, 137 F. Supp. 2d 413, 428-29 (S.D.N.Y. 2001); *SEC v. Todt*, No. 98 Civ. 3980, 2000 WL 223836, at *13 (S.D.N.Y. Feb. 25, 2000)).  *Accord SEC v. Wyly*, No. 10 Civ. 5760, 2014 WL 4792229, at *4 (S.D.N.Y. Sept. 25, 2014) (quoting *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007)).

penalty to be imposed.'"[51]

## IV.   DISCUSSION

### A.   Joint and Several Liability

The Named Defendants are jointly and severally liable for the amount of disgorgement and prejudgment interest.  The Named Defendants collaborated to violate the securities laws.[52]  Moreover, the actions of AGTI and Segal (the president and CEO of AGTI) are indistinguishable.  The Named Defendants even admit that "multiple actors, including Segal, collaborated together in a joint effort."[53]  Thus, the Named Defendants may be held jointly and severally liable.

The Relief Defendants are also each jointly and severally liable with the Named Defendants (but not with one another) for their respective amounts of disgorgement and prejudgment interest.  Each Relief Defendant received a portion of the ill-gotten gains and may therefore be held jointly and severally liable, along with the Named Defendants, for that portion.

---

[51]   *Opulentica*, 479 F. Supp. 2d at 331 (quoting *SEC v. Moran*, 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996)).

[52]   *See* Compl. ¶ 2 ("AGTI and Segal obtain[ed] and furnish[ed] false documents (including a sham assignment of debt and a fabricated and backdated corporate resolution and convertible note), to support a legal opinion letter that was provided to AGTI's transfer agent so that the transfer agent would issue millions of shares of purportedly unrestricted stock in an unregistered offering.").

[53]   AGTI Opp. at 7.

B.    **Disgorgement**

1.    **Named Defendants**

The SEC seeks disgorgement from the Named Defendants, jointly and severally, in the amount of $165,003.[54]  The Named Defendants argue that such disgorgement should be waived entirely, or, in the alternative, should be in the amount of $154,742.84.[55]

The Named Defendants contend that their poor financial condition allows the Court to order disgorgement, "but then waive such disgorgement based on the [Named Defendants'] *demonstrated* inability to pay."[56]  The Named Defendants point to Segal's negative net worth as evidence of his inability to pay disgorgement, regardless of the amount.[57]  Moreover, the Named Defendants state that AGTI is non-operational and has no assets.[58]

However, "[t]he fact that swindlers have run through the proceeds of the fraud and are now insolvent should not prevent the imposition of a remedy,

---

[54]    *See* SEC Mem. at 20.

[55]    *See* AGTI Opp. at 1.

[56]    *Id.* at 4 (citing *SEC v. Schiffer*, No. 97 Civ. 853, 2001 WL 504860, at *4 (S.D.N.Y. May 11, 2001)) (emphasis added).

[57]    *See id.*

[58]    *See id.*

since defendants may subsequently acquire the means to satisfy the judgment."[59]
Thus, the Named Defendants' claimed inability to pay is irrelevant, and I decline to
waive disgorgement.

Moreover, even if an inability to pay can excuse the payment of
disgorgement, the Named Defendants have not demonstrated their inability to pay
— now or in the future.  Segal relies on the SEC Form to demonstrate his current
inability to pay.[60]  However, the SEC Form lacks critical information that casts
doubt on the accuracy of the form as a whole.  For example, Segal asserts that he
has had only one bank account — Law Offices' bank account — since September
2007.[61]  It seems improbable that Segal would not have had and does not currently
have a personal bank account.  Furthermore, Segal does not list any transfers of
money or property of $1,000 or more since September 2007.[62]  This failure to
report leads to the plausible conclusion that Segal may have transferred his assets
elsewhere and now wants to hide that fact from the SEC.  Moreover, Segal
provides no explanation of his tax liability — other than to state it exists.  Finally,

---

[59]    *Inorganic Recycling Corp.*, 2002 WL 1968341, at *2.

[60]    *See* AGTI Opp. at 4.

[61]    *See* SEC Form at 4.

[62]    *See id.* at 7.

16

Segal is a licensed attorney.  He can likely earn a living practicing law or, at a minimum, find employment in some capacity.  Segal has therefore failed to demonstrate his current and future inability to pay.

As to AGTI's inability to pay, the only support for AGTI's financial condition is a single statement in Segal's declaration filed in opposition to the SEC's motion:  "AGTI is non-operational and does not have any assets."[63]  The SEC Form appended to Segal's declaration makes no mention of AGTI's financial condition.  Therefore, even if an inability to pay can authorize the waiver of disgorgement, the Named Defendants have not sufficiently demonstrated their present and future inability to pay.

In the alternative, the Named Defendants argue that the amount of disgorgement should be $154,742.84, not $165,003.[64]  As an initial matter, I find that $165,003 is a reasonable approximation of disgorgement given that the SEC derived this amount directly from the payments received by the Named Defendants.[65]  Nevertheless, the Named Defendants argue that the SEC's calculations are inaccurate because Segal actually paid Belmont $129,760.15 of the

---

[63]     Segal Decl. ¶ 4.

[64]     *See* AGTI Opp. at 1.

[65]     *See* SEC Mem. at 16-17.  After paying Belmont, Segal had $165,003 remaining in proceeds from the sale of AGTI stock.

ill-gotten gains, not $119,500.[66]  However, the Named Defendants have not

adequately substantiated this claim.  In his declaration, Segal only lists the date and

amount of each payment he made to Belmont, along with corresponding check

numbers.[67]  But Segal has not submitted copies of these checks to support these

contentions.  Therefore, the "'risk of uncertainty in calculating disgorgement

should fall upon the [Named Defendants] whose illegal conduct created that

uncertainty.'"[68]

        Moreover, if the Named Defendants are not required to pay $165,003

in disgorgement, the SEC would not collect the entirety of the ill-gotten gains.  In

settling with the SEC, Belmont agreed to disgorge $119,500, not $129,760.15.[69]

Thus, if the Named Defendants only disgorge $154,742.84, the SEC will not

collect the remaining $10,260.16.  Furthermore, it is ultimately irrelevant how

much Segal paid to Belmont given that "payment[s] to co-conspirators are not

deductible from the gross profits subject to disgorgement."[70]  Thus, I find that the

---

[66]    *See* AGTI Opp. at 3.

[67]    *See* Segal Decl. ¶ 6.

[68]    *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).

[69]    *See* Belmont/Meuse FJ at 4.

[70]    *SEC v. Rosenfeld*, No. 97 Civ. 1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001) (citing *SEC v. Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987)).

Named Defendants must disgorge $165,003 in ill-gotten gains.

### 2.   Relief Defendants

Like the Named Defendants, the Relief Defendants seek a waiver of their disgorgement due to inability to pay.[71]  However, as discussed above, that "swindlers have run through the proceeds of the fraud and are now insolvent should not prevent the imposition of a remedy[.]"[72]  Moreover, Relief Defendants have not submitted any evidence demonstrating their inability to pay.  The only evidence of their inability to pay stems from statements made by Segal in his declaration.[73]  Those statements are conclusory and do not rely on any corroborative documents.  Therefore, the Relief Defendants are not entitled to a waiver of their disgorgement and must pay disgorgement proportionate to the fraction they received of the ill-gotten gains.

### C.   Prejudgment Interest

While the Court has broad discretion to determine whether to award prejudgment interest, here I conclude that both the Named Defendants and the Relief Defendants are required to pay prejudgment interest on their disgorgement.

---

[71]     *See* AGTI Opp. at 1-2.

[72]     *Inorganic Recycling Corp.*, 2002 WL 1968341, at *2.

[73]     *See* Segal Decl. ¶ 5.

All defendants have had free use of the ill-gotten gains before and during the pendency of this litigation.  Furthermore, there is no evidence of any delay by the SEC that warrants a downward adjustment of prejudgment interest.  If anything, any delay is more likely attributable to Segal's refusal to cooperate.  Imposing prejudgment interest here "ensures that [all] 'defendant[s] do[] not profit' from [their] ill-gotten gains, including the time value of money."[74]

Nevertheless, all defendants argue that prejudgment interest is "unnecessary in this case."[75]  They contend that ordering prejudgment interest would be a "futile act" given the inability of all defendants to pay.[76]  However, "[d]isgorgement, *which includes the award of prejudgment interest*, would have no deterrent value if defendants could avoid it by spending their unlawful gains before the government discovers the fraud."[77]  Moreover, as previously stated, none of the defendants have demonstrated an inability to pay.  Therefore, prejudgment interest is appropriate here in the amount of $30,941.[78]

---

[74]   *SEC v. Tourre*, 4 F. Supp. 3d 579, 591 (S.D.N.Y. 2014) (quoting *SEC v. World Info. Tech., Inc.*, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008)).

[75]   AGTI Opp. at 5.

[76]   *Id.*

[77]   *Wyly*, 2014 WL 4792229, at *23.

[78]   All parties agreed that prejudgment interest would be calculated from June 18, 2009 based on the interest rate used by the IRS for the underpayment of

### D.   AGTI and Segal Are Each Liable for Civil Penalties

#### 1.   Third-Tier Penalties Are Appropriate

The Named Defendants' conduct satisfies both prerequisites for the imposition of third-tier penalties.  *First*, the Named Defendants' securities violations involved deceit and manipulation.  Given the explicit terms of the Partial Judgment, the Named Defendants cannot argue that they did not violate the securities laws as alleged in the Complaint.[79]  Consequently, because the Complaint alleged deceit- and manipulation-based violations,[80] the Named Defendants' conduct necessarily involved deceit and manipulation.  *Second*, the Named Defendants' securities violations "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[81]  Here, the scheme at issue resulted in the loss of over $300,000 to investors.[82]

#### 2.   Factors Favoring the Imposition of Civil Penalties

---

federal income tax as set forth in 26 U.S.C. § 6621(a)(2).  *See* Partial Judgment at 5.

[79]   *See id.*

[80]   Namely, section 10(b) of the Securities Act, which governs the use of "manipulative and deceptive devices."

[81]   15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

[82]   *See* Compl. ¶ 58.  The risk of substantial loss was likely greater.

Many factors weigh in favor of imposing civil penalties.  *First*, AGTI and Segal played central roles in the scheme that resulted in over $300,000 of ill-gotten gains.[83]  *Second*, AGTI and Segal acted with scienter in violating the securities laws.[84]  *Third*, Segal deliberately and repeatedly acted in contravention of the securities laws in order to bring the fraudulent scheme to fruition.[85]  *Fourth*, Segal has failed to admit any wrongdoing — he invoked his Fifth Amendment rights, and consented to the entry of partial judgment against him on a "neither admit nor deny" basis.[86]  *Fifth*, the conduct of AGTI and Segal created substantial

---

[83]     *See, e.g.*, Compl. ¶ 2 ("Belmont and Meuse *assisted* AGTI and Segal in creating the false, backdated, and fabricated documents and furnishing them to the attorney for use in drafting the opinion letter.") (emphasis added); Compl. ¶¶ 27-28 ("Segal *insisted* that Belmont provide Segal with various documents . . . Segal made these requests to create the basis for the issuance of purportedly unrestricted stock that could then be sold into the public market.") (emphasis added).  Also, Segal is president and CEO of AGTI, the company whose shares were sold in violation of the securities laws.

[84]     In order to violate Rule 10b-5, scienter is required.  *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 342 (2005)).

[85]     *See, e.g.*, Compl. ¶ 2 ("AGTI and Segal obtain[ed] and furnish[ed] false documents (including a sham assignment of debt and a fabricated and backdated corporate resolution and convertible note), to support a legal opinion letter that was provided to AGTI's transfer agent so that the transfer agent would issue millions of shares of purportedly unrestricted stock in an unregistered offering.").

[86]     *See* Segal Aff. ¶¶ 3-4; Partial Judgment at 1.

22

losses to others — over $300,000.[87]  *Sixth*, Segal refused to be deposed and made no effort to cooperate with the SEC.[88]

In opposition, the Named Defendants again argue that their poor financial condition should preclude the imposition of civil penalties.[89]  This argument remains unavailing for the reasons previously stated.

### 3.    Amount of Civil Penalties

The maximum third-tier penalties under the statute are $650,000 and $130,000 for AGTI and Segal, respectively.[90]  The SEC argues that the Court is authorized to impose the maximum third-tier penalty twice (based on the number of statutory violations)[91] or fifty-six times (based on the number of separate acts

---

[87]     *See* Compl. ¶ 58.

[88]     *See* Segal Aff. ¶¶ 3-4.

[89]     *See* AGTI Opp. at 8-9.

[90]     *See* 17 C.F.R. § 201.1004.

[91]     *See* SEC Mem. at 19.  For authority, the SEC cites *SEC v. Murray*, No. 05 Civ. 4643, 2013 WL 839840, at *5 (E.D.N.Y. Mar. 6, 2013) (citing *SEC v. Ehrenkrantz King Nussbaum, Inc.*, No. 05 Civ. 4643, 2012 WL 893917, at *5 (E.D.N.Y. Feb. 14, 2013)).  *Murray* offers one solution to the question of how many multiples of the civil penalty may be imposed in a given case.  The ambiguity arises from the phrase "each such violation" in the civil penalty statute. The SEC notes that the Named Defendants violated (1) sections 5(a) and 5(c) of the Securities Act; and (2) section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) thereunder.  *See* Compl. ¶ 3.

that violated the securities laws).[92]   By this arithmetic, the SEC contends that the Court may impose penalties up to $36,400,000 against AGTI and up to $7,280,000 against Segal.  Although the authority supporting the SEC's calculations authorizes the Court to impose these amounts, I find it appropriate to only impose one maximum civil penalty each against AGTI and Segal.  Because this is Segal's first violation of the securities laws,[93] and as AGTI's conduct in this case is merely an extension of Segal's own conduct, I find that imposing only one maximum civil penalty will serve as a sufficient deterrent, both specifically and generally, to future securities violations.  Thus, Segal is liable for a civil penalty in the amount of $130,000, and AGTI is liable for a civil penalty in the amount of $650,000.

## V.   CONCLUSION

For the foregoing reasons, the SEC's motion for final judgment is GRANTED.  All disgorgement, prejudgment interest, and civil penalties shall be paid as set forth herein, as well as in accordance with the Order of Final Judgment issued in conjunction with this Opinion.  The Clerk of the Court is directed to close

---

[92]   The SEC cites two cases in support: (1) *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013); and (2) *SEC v. Elliot*, No. 09 Civ. 7594, 2012 WL 2161647, at *11 (S.D.N.Y. Jun. 12, 2012).  The SEC counts each of the fifty-three trades as a separate act, in addition to (1) the sham assignment of debt; (2) the convertible note; and (3) the notice of conversion.  *See* SEC Mem. at 19.

[93]   *See* AGTI Opp. at 8.

this motion [Dkt. No. 62].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 15, 2014

**- Appearances -**

**For the SEC:**

Megan R. Genet, Esq.
Todd D. Brody, Esq.
U.S. Securities and Exchange Commission
200 Vesey Street, Suite 400
New York, New York  10281
(212) 336-0080

**For AGTI, Segal, Sierra Range, Senior Capital, and Law Offices:**

Eric M. Creizman, Esq.
Creizman PLLC
565 Fifth Avenue, 7th Floor
New York City, New York  10017
(212) 972-0200